In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-13-00234-CV

**KBMT OPERATING COMPANY, LLC, KBMT LICENSE COMPANY, LLC, BRIAN BURNS, JACKIE SIMIEN AND TRACY KENNICK,** Appellants

**V.**

**MINDA LAO TOLEDO,** Appellee

On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A-130025-C

**OPINION**

In this accelerated interlocutory appeal we must determine whether the trial court erred in failing to dismiss a physician's defamation claim and award attorneys' fees to the media defendants under the Texas Citizens Participation Act ("TCPA"). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-.011 (West Supp. 2013); *see also id.* § 27.008(b). We affirm the trial court's order.

1

**BACKGROUND**

Dr. Minda Lao Toledo alleged that over a two-day period, KBMT Operating Company, LLC, KBMT License Company, LLC, Brian Burns, Jackie Simien, and Tracy Kennick defamed her in three news broadcasts, which stated as follows:

> A Port Arthur pediatrician has been punished by the Texas Medical Board after the Board found she engaged in sexual contact with a patient and became financially involved with a patient in an inappropriate manner. Dr. Minda Lao Toledo will have to complete sixteen hours of continuing medical education, including eight hours of ethics and eight hours of risk management, and pay an administrative penalty of three thousand dollars. Toledo is a native of the Philippines and has been practicing medicine in Texas for five years.

The statements in the broadcasts derive from public records, which include a September 7, 2012 press release issued by the Texas Medical Board ("TMB") and the TMB's physician profile webpage for Dr. Toledo. The press release announced that the TMB disciplined fifty-five physicians at its August 2012 meeting. Under the heading "UNPROFESSIONAL CONDUCT[,]" the press release listed Dr. Toledo's name, medical license number, and location, and stated:

> On August 31, 2012, the Board and Minda Lao Toledo, M.D., entered into an Agreed Order requiring Dr. Toledo to complete 16 hours of CME including eight hours in ethics and eight hours in risk management, pass within one year and within three attempts the Medical Jurisprudence Exam, complete the professional boundaries course offered by the Vanderbilt Medical Center for Professional Health or a similar course offered by the University of California San Diego Physician Assessment and Clinical Education (PACE) program, and pay an administrative penalty of $3,000 within 90 days.

2

> The Board found Dr. Toledo behaved unprofessionally when she engaged in sexual contact with a patient and became financially or personally involved with a patient in an inappropriate manner.

Dr. Toledo's physician profile lists "PHILIPPINES" as her place of birth, states she "has actively practiced in the State of Texas for 5 year(s)[,]" and lists both her primary specialty and her secondary specialty as "PEDIATRICS." In addition, under the heading "TMB Filings, Actions and License Restrictions[,]" the physician's profile contains a link to a downloadable copy of an August 31, 2012 agreed disciplinary order entered by the TMB against Dr. Toledo (the "Agreed Order").

The Agreed Order purports to resolve the TMB's investigation of certain allegations of Dr. Toledo's "unprofessional sexual misconduct," which the Agreed Order more specifically describes as allegations "that while engaged in an intimate relationship with JC[,] [Dr. Toledo] injected JC with testosterone and human growth hormone without prescriptions and documentation in a medical record." The Agreed Order includes findings that (1) "Respondent is primarily engaged in the practice of pediatric medicine[]"; (2) "Respondent entered into a relationship with JC, who was not her patient at the time, and who was being prescribed testosterone to self-administer by another physician"; (3) "JC related that his diagnosis was an autoimmune disease, for which testosterone is non-therapeutic"; (4) "Respondent used her medical license to obtain testosterone and human growth

3

hormone for JC while she was in an intimate relationship with him, and administered these substances to him"; (5) "Respondent did not make or keep medical records on her treatment of JC, nor of her obtaining and using the testosterone and human growth hormone"; and (6) "Respondent accepted gifts from JC during the time she was treating him." The Agreed Order neither mentions the patient's age nor states that he was an adult when Dr. Toledo was treating him.

After the news broadcasts were aired, Dr. Toledo brought a defamation suit against the media defendants. Dr. Toledo alleged the broadcasts were defamatory per se in that they attributed a criminal activity and moral turpitude to her, tended to injure her business, and suggested professional incompetence. The media defendants contended that their broadcasts accurately reported information published by the TMB and moved to dismiss the defamation suit under the TCPA because it was based on the exercise of the right to free speech and the right to petition. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001(3)-(4), 27.003(a). Dr. Toledo responded that the broadcasts implied that she had had sex with a pediatric patient when the truth was that the patient in question was her adult boyfriend. Specifically, Dr. Toledo asserted that the "real story" was that she had been

> involved in a long term dating relationship with an older adult male, who had been taking testosterone (to self-administer) and growth hormone injections from another physician. At some point, for the convenience of her dating partner, and at his request, Dr. Toledo purchased the hormone and testosterone and gave the injections.

4

That's it. She was taken to task because this 60 year old adult male, soured by the recent breakup, made a report to the Texas Medical Board.

Following a hearing, the trial court denied the media defendants' motion to dismiss without stating a basis and was not asked to make findings of fact or conclusions of law. The media defendants timely filed this accelerated appeal. *See Combined Law Enforcement Ass'ns of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *4 (Tex. App.—Austin Jan. 31, 2014, no pet. h.) (mem. op.) (determining that the Texas Civil Practice and Remedies Code, as amended in 2013, confers jurisdiction over appeals filed pursuant to section 27.008 that are perfected before and active on the effective date of the amendment); *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, No. 01-12-00990-CV, 2013 WL 3716693, at *2 (Tex. App.—Houston [1st Dist.] July 16, 2013, pet. denied) (holding an interlocutory appeal is allowed from the trial court's written order denying a motion to dismiss under the TCPA).

## ANALYSIS

### A.    Procedure for Dismissal Under the TCPA

The stated purpose of the TCPA "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for

demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The TCPA is basically a gatekeeping function of the trial court, as section 27.003(b) provides that a motion to dismiss under the act is to be filed not later than the 60th day after the date of service of the legal action. *Id.* § 27.003(b). Dismissal is required under the TCPA "if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* § 27.005(b). The TCPA defines the "'[e]xercise of the right of free speech'" as "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). The TCPA defines the "'[e]xercise of the right to petition'" as, among other things, a communication pertaining to "(iii) an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;" and "(viii) a report of or debate and statements made in a proceeding described by Subparagraph (iii)[.]" *Id.* § 27.001(4)(A)(iii), (viii). Whether a party satisfies its burden under section 27.005(b) is a legal question we review de novo. *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

If the moving party satisfies its burden under section 27.005(b), the trial court must dismiss the legal action unless the party bringing the action "establishes by clear and specific evidence a prima facie case for each essential element of the

claim in question." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). "'Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue.'" *Rehak*, 404 S.W.3d at 726 (quoting *Duncan v. Butterowe, Inc.*, 474 S.W.2d 619, 621 (Tex. Civ. App.—Houston [14th Dist.] 1971, no writ)). "'In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party.'" *Id.* (quoting *Duncan*, 474 S.W.2d at 624). "'Clear and specific evidence has been described as evidence that is 'unaided by presumptions, inferences, or intendments.'" *Id.* (quoting *McDonald v. Clemens*, 464 S.W.2d 450, 456 (Tex. Civ. App.—Tyler 1971, no writ)). "On appeal from an order decided under section 27.005(c), we determine *de novo* whether the record contains a minimum quantum of clear and specific evidence that, unaided by inferences, would establish each essential element of the claim in question if no contrary evidence is offered." *Id.* at 727.

**B.      Exercise of the Right of Free Speech and the Right to Petition**

The media defendants contend that they satisfied their burden under section 27.005(b) to prove by a preponderance of the evidence that Dr. Toledo's legal action is based on the exercise of the right to free speech and the right to petition. We agree. In support of their motion to dismiss, the media defendants attached an affidavit from the news director for Channel 12 News. The affidavit stated that

7

after receiving an anonymous tip regarding recent disciplinary action by the TMB, Channel 12 News reviewed the TMB's website and discovered the September 7, 2012 press release and then reviewed Dr. Toledo's publicly available physician profile on the TMB website. The news director stated that "Channel 12 News found the [TMB's] disciplinary action against a local physician newsworthy and of concern to the public." He further stated that the information contained in the broadcasts was gathered solely from the press release and the physician profile available on the TMB's website. In addition, the media defendants attached affidavits from each of the three defendants who read the news report on the air. Each swore that he or she read the news report on the air from information prepared by Channel 12 News as part of its normal business and that he or she believed the information contained in the report "is true and correct, as well as newsworthy and of concern to the public."

The broadcasts pertained to the TMB's public discipline of a physician, which is a matter of public concern because it relates to health or safety, to the government, and to a service in the marketplace. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)(A), (C), (E). The exercise of the right to petition includes a communication pertaining to proceedings before a department of the state, or a report of statements made during such proceedings. *Id.* § 27.001(4)(A)(iii), (viii). Because the broadcasts were communications pertaining to a proceeding before a

8

department or subdivision of the state government, they constitute an exercise of the right to petition. Therefore, to avoid mandatory dismissal under the statute, Dr. Toledo was required to establish in the record a minimum quantum of clear and specific evidence, unaided by inferences, of each essential element of her claim. *Id.* § 27.005(c).

## C. Prima Facie Case of Defamation

To maintain a cause of action for defamation, Dr. Toledo must prove that the media defendants: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Therefore, to overcome the motion to dismiss, Dr. Toledo must establish a prima facie case by presenting clear and specific evidence for each essential element of her defamation claim. The parties do not dispute that the media defendants published the broadcasts in question. Therefore, we turn to the second element of defamation and determine whether Dr. Toledo met her burden of proof to present clear and specific evidence that the broadcasts were defamatory concerning Dr. Toledo.

### 1. Defamatory Statement

A defamatory statement "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011) (describing elements of libel)[1]. Because a "'chilling effect' would be antithetical to the First Amendment's protection of true speech on matters of public concern, . . . a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986).

Some statements are so obviously injurious to a plaintiff's reputation that they require no proof of injury to make them actionable. *See Hancock v. Variyam*, 400 S.W.3d 59, 63-64 (Tex. 2013); *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580-81 (Tex. App.—Austin 2007, pet. denied). Such statements are considered defamatory per se. *Id.* A false statement will typically be classified as defamatory per se if it: (1) "injures a person in his office, profession, or occupation[;]" (2) "charges a person with the commission of

---

[1] "Defamatory statements read from a script and broadcast constitute libel rather than slander." *Dolcefino v. Randolph*, 19 S.W.3d 906, 917 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex. 1969)).

10

a crime[;]" (3) "imputes sexual misconduct[;]" or (4) "accuses one of having a loathsome disease[.]" *Tex. Disposal Sys. Landfill*, 219 S.W.3d at 581. If the alleged statement is determined to be defamatory per se, general damages are presumed without requiring specific evidence of harm to the plaintiff's reputation, thereby entitling the plaintiff to recover, at a minimum, nominal damages. *Id*.

A showing of the substantial truth of a broadcast will defeat a defamation claim. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990). "The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been." *Id.* (citing 53 C.J.S. *Libel and Slander* § 109(a) (1987)). "This evaluation involves looking to the 'gist' of the broadcast." *Id.* (citing W. PROSSER & P. KEETON, PROSSER AND KEETON ON TORTS § 116 (1984)). "Gist" means: "1. The ground or essence (of a legal action) <the gist of the crime>. 2. The main point <she skimmed the brief to get the gist of it>." *See* BLACK'S LAW DICTIONARY 759 (9th ed. 2009). If the publication correctly conveys a story's gist, although erring in the details, the publication is substantially true and is not actionable. *See Neely v. Wilson*, 418 S.W.3d 52, 63-64 (Tex. 2013). "If the underlying facts as to the gist of the defamatory charge are undisputed, then we can disregard any variance with

11

respect to items of secondary importance and determine substantial truth as a matter of law." *McIlvain*, 794 S.W.2d at 16.

This case concerns "the converse of the substantial truth doctrine." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). "Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Id.* at 114. This theory "permit[s] liability for the publication that gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong." *Id.* at 115. "[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Id.* Dr. Toledo, therefore, bore the burden of presenting the requisite minimum quantity of evidence that the "gist" of the broadcast in question was false as a part of her prima facie case of defamation.

The media defendants assert that the broadcasts were not defamatory because all of the statements in the broadcasts were literally true and because they accurately reported the statements contained in the TMB's official publications. They argue their newscasts, like the TMB's press release and Agreed Order, did

12

not identify the age or identity of the patient with whom Dr. Toledo had "sexual contact" and became "financially or personally involved . . . in an inappropriate manner." They claim they added no descriptive terms to describe the TMB's sanctions of Dr. Toledo. In short, they contend that Dr. Toledo brought forth no clear and specific evidence that they falsely reported the TMB's recitation of its disciplinary action against Dr. Toledo. We disagree.

Dr. Toledo attached video clips and copies of the transcripts of the three allegedly defamatory broadcasts to her response to the media defendants' motion to dismiss. Each of the broadcasts begins by stating that "[a] Port Arthur pediatrician has been punished by the Texas Medical Board after the Board found she engaged in sexual contact with a patient and became financially involved with a patient in an inappropriate manner." Although much of the information in this statement has been quoted, nearly verbatim, from the press release, the broadcasts, unlike the press release, begin with the assertion that the subject of the broadcasts is a "pediatrician." A person of ordinary intelligence viewing the broadcasts would know that a pediatrician is a doctor that specializes in the medical treatment of children. Therefore, the average viewer could, and in most cases would, reasonably conclude that the "patient" of a "pediatrician" is a child. While it is a true statement, as the media defendants contend, that Dr. Toledo is a pediatrician and that the TMB did discipline her for having improper sexual contact with a

13

patient, the media defendants' decision to place these two facts together in the same sentence, particularly with the word "pediatrician" being used, in essence, as the subject of the phrase "engaged in sexual contact with a patient," resulted in a statement that was reasonably capable of being interpreted by the average listener as stating that Dr. Toledo was punished for having improper sexual contact with a child.

Further, the remaining content of the newscasts does not effectively negate the impression that the patient referenced in the broadcast was a child. In addition to stating that Dr. Toledo was found to have engaged in "sexual contact with a patient," the broadcasts state that Dr. Toledo was found to have become "financially involved with a patient in an inappropriate manner." The broadcasts do not define or otherwise explain what is meant by the phrase "financially involved." Depending on the context, the term could reasonably be construed to have different meanings, including the simple act of gift-giving, which is equally likely to involve an adult or a child. Viewing the broadcast as a whole, a viewer of ordinary intelligence could reasonably conclude that a pediatrician who has engaged in sexual contact with a minor patient might also engage in other inappropriate conduct with that patient, including giving money or gifts to, or accepting money or gifts from, that patient.

We also disagree with the media defendants' argument that the broadcasts' listing of "administrative—not criminal—sanctions imposed by the TMB" removes any implication that Dr. Toledo engaged in sexual contact with a minor patient. The scope of the broadcast is limited to a report of findings and conclusions made in a proceeding before the Texas Medical Board. The Texas Medical Board is an administrative agency with no authority to criminally prosecute a physician. Therefore, the mention of only administrative sanctions in a report that is limited to coverage of an administrative proceeding would not necessarily alert the average viewer that the sanctioned offense was not a crime. Further, we disagree with the media defendants' argument that the fact that the administrative sanctions referenced in the broadcasts were not more severe negated the impression created by the first sentence that Dr. Toledo had engaged in sexual contact with a child. While it is possible that a careful viewer might have realized that the administrative sanctions referenced in the broadcasts were not the most severe administrative sanctions available to the TMB and might have deduced from this fact that the patient in question was not a child, we must analyze the broadcasts in the context of how the average viewer, not a "careful viewer," would have perceived the broadcasts. *See Turner*, 38 S.W.3d at 119 (concluding that a statement's defamatory meaning must be viewed from the standpoint of an "ordinary" listener, not a "careful" listener, and noting that "'courts must refrain

15

from a 'hair splitting analysis' of what is said . . . to find an innocent meaning[.]'" (quoting *Forsher v. Bugliosi*, 608 P.2d 716, 722 (Cal. 1980))). In this respect, we do not believe that an average viewer is sufficiently familiar with the scope of the TMB's disciplinary authority—including the administrative rules and regulations governing the range of disciplinary sanctions and penalties available to the TMB, the mitigating factors that the TMB is authorized to consider in imposing a sanction or penalty, or the effect of such factors on any particular sanction or penalty—such that the statements in the broadcast would clarify in the mind of the average viewer that the patient referenced in the broadcast is not a child. *See id.* at 114 (noting that a "publication should be viewed 'not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader'" (quoting *Kapellas v. Kofman*, 459 P.2d 912, 920 (Cal. 1969))). We conclude, therefore, that Dr. Toledo has presented evidence that when viewing the broadcasts as a whole in light of the surrounding circumstances, a person of ordinary intelligence would reasonably but erroneously conclude that the "gist" of the broadcast was that Dr. Toledo was punished for engaging in inappropriate conduct, including sexual contact, with a child.

We also find that Dr. Toledo presented evidence that the gist of the broadcast was false. Dr. Toledo attached her own affidavit as an exhibit to her

response to the media defendants' motion to dismiss. In the affidavit, Dr. Toledo stated that the patient in question was not a child, but was "a sixty year old man who[m] [she] had been dating for a considerable time." This affidavit testimony constitutes clear and specific evidence that the "gist" of the broadcasts—*i.e.*, that Dr. Toledo was punished by the TMB for engaging in inappropriate conduct, including sexual contact, with a child—was not substantially true because it was not actually true and was considerably more damaging to Dr. Toledo's reputation, in the mind of an average listener, than a truthful statement would have been.[2] *See*

_____

[2] The media defendants argue that the broadcasts are not defamatory because they accurately reported the TMB's recitation of its disciplinary action against Dr. Toledo. In support of this argument, the media defendants appear to rely, at least in part, on the rule adopted by several Texas courts of appeals, which, interpreting the Texas Supreme Court's decision in *McIlvain v. Jacobs*, have concluded that when determining whether a report of third-party allegations under investigation is substantially true, a media defendant need not prove that the allegations are true, but must only demonstrate that the allegations were, in fact, made and accurately reported. *See, e.g., Avila v. Larrea*, 394 S.W.3d 646, 657, 659 (Tex. App.—Dallas 2012, pet. denied); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 612 (Tex. App.—San Antonio 2002, no pet.); *Dolcefino v. Randolph*, 19 S.W.3d 906, 918 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Neely*, 418 S.W.3d at 64.

*McIlvain* concerned a broadcast regarding an investigation by the City of Houston into alleged misconduct by employees in its water maintenance division. 794 S.W.2d at 15. The allegedly defamatory broadcast was made during the city's investigation and indicated that the public integrity section was investigating allegations that: (1) employees cared for the elderly father of the water maintenance manager on city time; (2) the employees were putting in for overtime to complete their city duties; (3) authorities were looking for a gun at a water treatment facility; and (4) employees had been drinking on the job. *Id.* Two of the water maintenance division employees sued the broadcasters for defamation. *Id.*

17

*Neely*, 418 S.W.3d at 63; *McIlvain*, 794 S.W.2d at 16. Further, it implies conduct that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001. It also constitutes clear and specific evidence that the broadcasts contained language that was reasonably capable of injuring Dr. Toledo in her office, profession, or occupation; (2) charging Dr. Toledo with the commission of a crime; and (3) imputing sexual misconduct. *See Tex. Disposal*

Thereafter, the city's investigation found all of the allegations to be true. *Id*. at 16. The court granted summary judgment in favor of the media defendants. *Id*. at 15. The Texas Supreme Court affirmed the trial court's ruling because the "broadcast statements are factually consistent with [the government's] investigation and its findings[]" and were therefore "substantially correct, accurate and not misleading." *Id*. at 16.

Later, in *Neely*, the Texas Supreme Court clarified that it "did not establish a third-party allegation rule in *McIlvain*." *Neely*, 418 S.W.3d at 65. Instead, the Court stated that it only "measured the truth of the allegations in *McIlvain* against the government investigation that found them to be true." *Id*. Nevertheless, *Neely* expressly left open the question of whether accurate reporting by the media is one way of establishing the substantial truth of the gist of a broadcast that repeats third-party allegations under investigation. *Id.* at 57 n.3, 64-65. We need not address this question, however, because the broadcasts in the present case do not report third-party allegations that were "under investigation" at the time the broadcasts were published. *See UTV*, 82 S.W.3d at 612 (concluding that the defendant must prove that the "third[-]party allegations reported in [the] broadcast were, in fact, made and under investigation"); *KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App.—Houston [14th Dist.] 1997, no writ) (concluding that when "the report is merely that allegations were made and they were under investigation, [a media defendant must prove] that [the] allegations were in fact made and under investigation in order to prove substantial truth."). Instead, the broadcasts report findings and sanctions made by the TMB against Dr. Toledo after the TMB's investigation of Dr. Toledo had already concluded.

18

*Sys. Landfill*, 219 S.W.3d at 581. When an ambiguity exists about the meaning and effect of the words or when a predicate fact question remains about whether the statements were published or were false, a jury should determine the statement's meaning. *Klentzman v. Brady*, No. 01-11-00765-CV, 2013 WL 5655845, at **14-15 (Tex. App.—Houston [1st Dist.] Oct. 17, 2013, no pet. h.); *Tex. Disposal Sys. Landfill*, 219 S.W.3d at 581-83 (noting that defamation per se is generally a legal question, a jury question is presented where the defamatory character of a statement arises not from the defendants' blatant statements but from the impressions the defendants created and the inferences they encouraged). We hold that Dr. Toledo presented the requisite minimum quantum of clear and specific evidence, unaided by inferences, that the broadcasts in question were defamatory concerning her. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).

**2. Negligence**

In a defamation action, a private plaintiff must prove that a media defendant acted with negligence concerning the truth of the statement in question. *See Neely*, 418 S.W.3d at 61. The media defendants argue Dr. Toledo cannot satisfy her burden to present clear and specific evidence that they acted with negligence because the evidence shows they accurately represented the contents of the Agreed Order and press release. The media defendants contend, therefore, that they are protected from liability under the "fair report privilege," which relieved them of

19

any duty to independently investigate and report additional information not provided by the TMB, including the patient's age and identity.[3]

In Texas, the Legislature has codified the fair report privilege to the extent it applies to cases of libel.[4]  *See Neely*, 418 S.W.3d at 68. Specifically, section 73.002(b)(1) of the Texas Civil Practice and Remedies Code provides that publications are privileged as long as they constitute "a fair, true, and impartial account of" a judicial proceeding or other official proceedings to administer the law.[5]  *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.002(b)(1)(A), (B) (West 2011);

---

[3]This is an appeal from the denial of a motion to dismiss under the TCPA, not an appeal from the denial of a motion for summary judgment based on a First Amendment defense by a media defendant.  *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 27.008 *with* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (West Supp. 2013).  This appeal was perfected before the effective date of the most recent amendment to section 51.014. *See id.* § 51.014(a)(12) (authorizing accelerated appeal of the denial of a motion to dismiss under the TCPA).  We address the parties' arguments regarding the "fair report privilege" as it is presented by the appellants in their brief to this Court; that is, as the privilege relates to whether Dr. Toledo met her burden to establish a prima facie case of the media defendants' malice or negligence as an element of her defamation claim. *See id.* § 27.005(c).

[4]The fair report privilege has also been referred to as the "official proceedings privilege" and the "judicial proceedings privilege," as applicable.  *See Neely*, 418 S.W.3d at 68-69.

[5] Texas courts have repeatedly found that press releases issued by governmental agencies can trigger application of the fair report privilege. *See Goss v. Houston Cmty. Newspapers*, 252 S.W.3d 652, 655 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Williams v. Cox Newspapers, Inc.*, No. 06-09-00041-CV, 2009 WL 2340672, at *4 (Tex. App.—Texarkana July 31, 2009, no pet.) (mem.

*see also Neely*, 418 S.W.3d at 68. The fair report privilege assesses whether the reporter's account of the proceedings was fair, true, and impartial, even if the underlying facts being reported are untrue or defamatory. *See Neely*, 418 S.W.3d at 68. In other words, the accuracy of the publication is determined not by comparing it to the actual facts, but to the statements made in the official proceeding or report on which the publication is based. *See id.*; *Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 883 (Tex. 1970) ("The publication would be within the privilege provided by statute as long as it purported to be, and was, only a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true[.]"). The privilege "only extends to statements that: (1) are substantially true and impartial reports of the proceedings, and (2) are identifiable by the ordinary reader as statements that were made in the proceeding." *Neely*, 418 S.W.3d at 68. The privilege, however, "does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a); *see also Neely*, 418 S.W.3d at 69.

The media defendants contend that the fair report privilege applies because "[t]he press release and [Agreed Order] identified [Dr.] Toledo as a pediatrician and stated that she 'behaved unprofessionally when she engaged in sexual contact

op.); *Freedom Commc'ns, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602, at *4 (Tex. App.—Eastland June 15, 2006, no pet) (mem. op.).

21

with a patient and became financially or personally involved with a patient in an inappropriate manner'" and because the media defendants "accurately reported and represented the contents of the TMB's official publications" in the broadcasts. We disagree. While both the broadcasts and the press release state that Dr. Toledo "engaged in sexual contact with a patient" and became financially involved with a patient in an inappropriate manner, the broadcasts, unlike the press release, begin with the assertion that the person who engaged in such conduct was a "pediatrician." As stated above, this editorial addition to the broadcasts by the media defendants created an impression that could reasonably be interpreted by the average viewer as stating that Dr. Toledo was punished for engaging in inappropriate conduct, including sexual contact, with a child. The press release, by contrast, does not mention Dr. Toledo's medical specialty and contains no information to suggest that the patient in question was a child. The broadcasts, therefore, were potentially more damaging to Dr. Toledo's reputation than an account consistent with the press release would have been. As a result, the broadcasts were not a fair, true, and impartial account of the TMB's press release.

We also find that the broadcasts were not "a fair, true, and impartial account of" the Agreed Order. First, we note that although the media defendants allege that they relied on the Agreed Order in preparing the broadcasts, the media defendants did not present evidence showing that they actually reviewed the Agreed Order

22

before airing the broadcasts. The affidavit of the Channel 12 news director, attached to the media defendants' motion to dismiss, states only that "[t]he information contained in [the] news report was gathered solely from [the] Texas Medical Board's press release and its physician profile [of] Dr. Toledo." Because the Agreed Order was accessible through a link on the physician profile webpage, it is unclear from the affidavit whether the media defendants reviewed only the content of the physician profile webpage or if they also reviewed the downloadable Agreed Order as part of that webpage. However, even if we assume that the media defendants reviewed the Agreed Order, the evidence does not conclusively establish that the broadcasts accurately reported the contents of that document. While it is true, as the media defendants assert, that the Agreed Order states that Dr. Toledo is a pediatrician, the nine-page Agreed Order references that fact in only one paragraph (under the "General Findings" section) and only as background information about Dr. Toledo, not as a relevant factor in the charges or findings against her. Unlike the broadcasts, the Agreed Order does not include the fact that Dr. Toledo is a pediatrician in the same sentence with a description of the conduct in which Dr. Toledo was found to have engaged. Further, the Agreed Order describes the "Board Charges" against Dr. Toledo, in their entirety, as follows:

> At issue in this investigation are allegations of the Respondent's unprofessional sexual misconduct. Specifically, it was alleged that while engaged in an intimate relationship with JC the Respondent

23

> injected JC with testosterone and human growth hormone without prescriptions and documentation in a medical record.

Nothing in this description suggests that "JC" is a child or that Dr. Toledo was charged by the TMB with sexually abusing a child. Indeed, nothing in this description draws any focus whatsoever on the age of the patient. Instead, the description suggests only that Dr. Toledo was accused of administering medications to a person with whom she was intimately involved without a prescription or proper medical documentation. Similarly, the findings of fact and conclusions of law set forth in the Agreed Order suggest only that the TMB found that Dr. Toledo administered medications to a person with whom she was intimately involved without a prescription or proper medical documentation and sanctioned her for such conduct. The Agreed Order contains no findings or conclusions identifying the patient as a child or suggesting that Dr. Toledo had sexual contact with a child. Because the broadcasts, by contrast, can reasonably be interpreted to suggest to the average viewer that the patient in question was a child, the broadcasts were more damaging to Dr. Toledo's reputation than a report consistent with the Agreed Order would have been. Accordingly, it has not been shown that the broadcasts were "a fair, true, and impartial account of" the Agreed Order. The media defendants, therefore, have not established by a preponderance of the evidence at this stage of the litigation that the "fair report privilege" applies.

24

Having concluded the privilege has not been shown to apply, we now examine whether Dr. Toledo presented clear and specific evidence that the media defendants acted with negligence with respect to the truth of the broadcasts in question. In the context of a defamation case, "a broadcaster is negligent if she knew or should have known a defamatory statement was false." *Neely*, 418 S.W.3d at 72. "Negligent conduct is determined by asking 'whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'" *Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi 2003, pet. denied) (quoting RESTATEMENT (SECOND) OF TORTS § 580B cmt. g (1977)). Defamation liability, however, "may not be predicated on 'a factual misstatement whose content [would] not warn a reasonable prudent editor or broadcaster of its defamatory potential.'" *Neely*, 418 S.W.3d at 72 (quoting *Foster v. Laredo Newspapers, Inc*., 541 S.W.2d 809, 820 (Tex. 1976)).

Dr. Toledo attached copies of the TMB press release, the TMB physician profile of Dr. Toledo, and the Agreed Order to her response to the media defendants' motion to dismiss. Significantly, the press release, physician profile, and Agreed Order do not state the age of the patient in question. They also do not contain any information to suggest that the patient was a child. These, however, are the very documents on which the media defendants claim they relied in

25

preparing the broadcasts in question.[6] As set forth above on the evidence presented to the trial court, a reasonable view of the "gist" of the broadcasts was that Dr. Toledo was punished for engaging in inappropriate conduct, including sexual contact, with a child. Accordingly, we conclude that Dr. Toledo presented a sufficient minimum quantity of clear and specific evidence that the media defendants acted negligently by broadcasting a report, the "gist" of which was that Dr. Toledo was punished for having sexual contact with a child, when the documents on which the media defendants admittedly relied to prepare the broadcast do not contain any information stating the age of the patient or suggesting that the patient was a child. Further, the gist of the broadcasts would warn a reasonably prudent broadcaster of the broadcasts' defamatory potential.

The media defendants have not shown that the trial court erred in denying their motion to dismiss Dr. Toledo's suit at this early stage of the litigation. Because Dr. Toledo presented a prima facie case to the trial court, we overrule the sole issue raised in this accelerated appeal, and affirm the trial court's order denying the appellants' motion to dismiss the case.

---

[6] As set forth above, the media defendants contend that they reviewed the Agreed Order in preparing the broadcasts in question. They did not, however, present evidence supporting this contention. Even assuming that the media defendants did review the Agreed Order in preparing the broadcasts, our conclusion would remain the same because, as set forth above, the Agreed Order does not state the age of the patient in question and does not contain any information suggesting that the patient is a child.

26

AFFIRMED.


_____
CHARLES KREGER
Justice


Submitted on October 24, 2013
Opinion Delivered May 8, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.


27