# IN THE SUPREME COURT OF TEXAS

════════════

No. 14-0456

════════════

KBMT OPERATING COMPANY, LLC, KBMT LICENSE COMPANY, LLC,
BRIAN BURNS, JACKIE SIMIEN AND TRACY KENNICK, PETITIONERS,

v.

MINDA LAO TOLEDO, RESPONDENT

════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

════════════════════════════════════════════════

**Argued November 13, 2015**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON and JUSTICE WILLETT joined.

The First Amendment requires that a private individual who sues a media defendant for defamation over statements of public concern bear the burden of proving that the statements were false—that is, that the gist of the statements was not substantially true.[1] We hold that the truth of a media report of official proceedings of public concern must be measured against the proceedings themselves, not against information outside the proceedings. The media may report on the

---

[1] *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–777 (1986); *Neely v. Wilson*, 418 S.W.3d 52, 62–63 (Tex. 2013).

proceedings themselves without independently investigating the matters involved. Because we conclude that the plaintiff in this case did not meet her burden under the Texas Citizens Participation Act[2] of establishing by clear and specific evidence a prima facie case that the media defendants' broadcast was false, an essential element of her defamation claim, we hold that the defendants were entitled to dismissal.[3] Accordingly, we reverse the judgment of the court of appeals[4] and remand the case to the trial court for further proceedings.

The Texas Medical Board ("the Board") disciplined Minda Lao Toledo, a Port Arthur physician, for "unprofessional conduct". The Board issued a two-sentence press release stating that Toledo "behaved unprofessionally when she engaged in sexual contact with a patient and became financially or personally involved with a patient in an inappropriate manner." The press release further stated that Toledo had entered into an agreed order requiring her to complete ethics training, pass a professionalism course, and pay $3,000 as an administrative penalty.[5]

---

[2] TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011; Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 1, 2011 Tex. Gen. Laws 961, 961 [HB 2973].

[3] *Id.* § 27.005.

[4] 434 S.W.3d 276 (Tex. App.—Beaumont 2014).

[5] The press release stated in full:

**Toledo, Minda Lao, M.D., Lic. No. M2487, Port Arthur**
On August 31, 2012, the Board and Minda Lao Toledo, M.D., entered into an Agreed Order requiring Dr. Toledo to complete 16 hours of CME including eight hours in ethics and eight hours in risk management, pass within one year and within three attempts the Medical Jurisprudence Exam, complete the professional boundaries course offered by the Vanderbilt Medical Center for Professional Health or a similar course offered by the University of California San Diego Physician Assessment and Clinical Education (PACE) program, and pay an administrative penalty of $3,000 within 90 days. The Board found Dr. Toledo behaved unprofessionally when she engaged in sexual contact with a patient and became financially or personally involved with a patient in an inappropriate manner.

Toledo's profile on the Board website included the text of the press release, stated that she was born in the Philippines and had been practicing in Texas for five years, and gave a Port Arthur address. The profile contained a link to the order to which Toledo, represented by legal counsel, had agreed. The order stated that Toledo was 51 years old and "primarily engaged in the practice of pediatric medicine." The order further stated that she "used her medical license to obtain testosterone and human growth hormone for JC while she was in an intimate relationship with him and that she "accepted gifts from JC during the time she was treating him." The order concluded that the Board was authorized to discipline Toledo for "unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public", "engaging in sexual contact with a patient", "becoming financially or personally involved with a patient in an inappropriate manner", "prescribing or administering a drug or treatment that is nontherapeutic in nature or nontherapeutic in the manner the drug or treatment is administered or prescribed", and the "commission of an act that violates . . . state or federal law . . . connected with the physician's practice of medicine".

KBMT, an ABC-affiliated television station in Beaumont, part of the same metropolitan area as Port Arthur, learned of the press release and found it, Toledo's profile, and the agreed order on the Board's website. KBMT then aired this 30-second report of the Board's action:

> A Port Arthur pediatrician has been punished by the Texas Medical Board after the Board found she engaged in sexual contact with a patient and became financially involved with a patient in an inappropriate manner. Dr. Minda Lao Toledo will have to complete sixteen hours of continuing medical education, including eight hours of ethics and eight hours of risk management, and pay an administrative penalty of three thousand dollars. Toledo is a native of the Philippines and has been practicing medicine in Texas for five years.

KBMT ran the report four times in 24 hours, but the last time the news anchor added that Toledo's patient was "an adult".

Toledo sued KBMT and three of its employees (collectively, "KBMT") for defamation, alleging that by stating she was a pediatrician, and by omitting that she was treating the patient with whom she had had sexual contact with testosterone, the report falsely implied that the patient was a child when, in fact, he was a 60-year-old man with whom she had been in a long-term dating relationship. The patient's age did not appear in any of the information on the Board's website. KBMT moved for dismissal under the Texas Citizens Participation Act ("the Act"),[6] which allows for the early dismissal of a legal action implicating the defendant's free-speech rights unless the plaintiff can establish each element of her claim with clear and specific evidence.[7] The trial court denied KBMT's motion and the court of appeals affirmed, concluding that Toledo had established a prima facie case of defamation.[8] The court concluded that Toledo had shown the requisite falsity because the gist of the broadcast was that she had had sexual contact with a child.[9]

We granted KBMT's petition for review.[10]

---

[6] TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011. The Act is sometimes referred to as an anti-SLAPP law—the acronym standing for strategic lawsuit against public participation.

[7] *Id.* § 27.003(a) ("If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action."); *id.* § 27.005(c) ("The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question.").

[8] 434 S.W.3d 276, 290 (Tex. App.—Beaumont 2014).

[9] *Id.* at 289.

[10] 58 Tex. Sup. Ct. J. 477 (Mar. 13, 2015). An appeal to the court of appeals from an order denying a motion to dismiss under the Act is permitted by statute. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12). Although the statute was enacted after this suit was filed, *see* Act of May 24, 2013, 83rd Leg., R.S., ch. 1042, § 4, 2013 Tex. Gen. Laws 2499,

The Act provides that a suit based on a defendant's exercise of his free speech rights must be dismissed[11] unless the plaintiff "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question."[12] Toledo's defamation suit against KBMT is based on its exercise of its right of free speech, as Toledo acknowledges. Thus, KBMT was entitled to dismissal unless Toledo established a prima facie case for each element of a defamation cause of action. KBMT argues that one element of Toledo's action is that its report was false, and that Toledo has not made a prima facie case of falsity.

At common law, truth was a defense in a suit for defamation; falsity was not an element of the action.[13] But as we recently observed, "[t]he United States Supreme Court and this Court long ago shifted the burden of proving the truth defense to require the plaintiff to prove the defamatory statements were false when the statements were made by a media defendant over a public concern."[14] We referred specifically to the United States Supreme Court's 1986 decision in *Philadelphia*

---

2500 [HB 2935], jurisdictional statutes apply retroactively, *see Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia*, 324 S.W.3d 544, 547–548 (Tex. 2010). An interlocutory appeal to this Court is allowed when "one of the courts of appeals holds differently from a prior decision of another court of appeals or of the supreme court", TEX. GOV'T CODE § 22.225(b)(3), (c), (e)—that is, "when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants", *id.* § 22.001(e). As explained below, the court of appeals' holding on the substantial truth doctrine conflicts with this Court's holdings in *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013), and *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990).

[11] TEX. CIV. PRAC. & REM. CODE § 27.005(b).

[12] *Id.* § 27.005(c).

[13] *Neely*, 418 S.W.3d at 62.

[14] *Id.*

*Newspapers, Inc. v. Hepps*[15] and our 1990 decision in *McIlvain v. Jacobs*.[16] A statement need not be perfectly true; as long as it is substantially true, it is not false.[17] The test for whether a report like KBMT's is substantially true is whether the "broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been".[18] This requires determining the import of the broadcast as a whole—its gist to the ordinary listener—and comparing it to a truthful report.[19]

But a truthful report of what? An accurate report of official proceedings that do not themselves present a true picture of the actual facts will necessarily share the same defect. The media have a common-law privilege to report on judicial proceedings without regard for whether the information from such proceedings is actually true.[20] In 1901, the Legislature codified this privilege and extended it to "a fair, true, and impartial account" of not only judicial proceedings but all official proceedings.[21] Requiring the media to independently investigate the facts before reporting on official proceedings would ill serve the public's interest in government activities. When the privilege applies,

---

[15] 475 U.S. 767, 777 (1986).

[16] 794 S.W.2d at 14, 15.

[17] *Neely*, 418 S.W.3d at 63–64.

[18] *Id.* at 63 (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000), *McIlvain*, 794 S.W.2d at 16, and *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–517 (1991)).

[19] *Neely*, 418 S.W.3d at 63.

[20] *Id.* at 68.

[21] Act of March 26, 1901, 27th Leg., R.S., ch. 26, § 3, 1901 Tex. Gen. Laws 30, 30 [SB 25] (current version at TEX. CIV. PRAC. & REM. CODE § 73.002). The statute applies to a "publication by a newspaper or other periodical", the only media in existence in 1901, but does not exclude other media publications. TEX. CIV. PRAC. & REM. CODE § 73.002(a). In *Neely*, we applied the privilege to a television broadcast. *Neely*, 418 S.W.3d at 69.

the gist of an allegedly defamatory broadcast must be compared to a truthful report of the official proceedings, not to the actual facts.[22]

Although the statute does not allocate the burden of proof for establishing the privilege, in 1970 we held in *Denton Publishing Co. v. Boyd* that the privilege is an affirmative defense on which the defendant has the burden of proof.[23] Since then, as we have explained, the United States Supreme Court in *Hepps* and this Court in *McIlvain* have held that the First Amendment requires that a private figure suing a media defendant over statements on matters of public concern prove the statements are false. This rule, as *Hepps* explained, is "[t]o ensure that true speech on matters of public concern is not deterred".[24] Those decisions have partially abrogated our holding in *Denton Publishing*. While the defendant must still prove the applicability of the privilege—that the defendant is part of the media and that the statements complained of were an account of official proceedings of public concern—the plaintiff must prove the statements were false.

Thus, we hold that a private individual who sues a media defendant for defamation over a report on official proceedings of public concern has the burden of proving that the gist of the report was not substantially true—that is, that the report was not a fair, true, and impartial account of the

---

[22] *Id.* at 68 ("The official/judicial proceedings privilege assesses whether the reporter's account of the proceedings (not the underlying allegations made in those proceedings) was fair, true, and impartial." (citing *Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 883 (Tex. 1971))).

[23] 460 S.W.2d at 884.

[24] *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–777 (1986).

7

proceedings. That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings.[25]

Toledo argues that the gist of KBMT's broadcast to the ordinary listener was that she had sexual contact with a child because it identified her as a pediatrician at the outset and stated that she had been punished for having sexual contact with a patient without stating the patient's age. We disagree. Any ordinary listener would know that improper sexual contact with a child by an adult old enough to be a physician would be a crime prosecuted by the district attorney, not by the Texas Medical Board. No ordinary listener could reasonably have thought that such a crime would be punished with a slap on the wrist—a few hours of continuing education and a small fine. Nor could an ordinary listener reasonably have thought that a pediatrician would be financially involved with a minor. The stated subject of the report was professional discipline of a local doctor, and the ordinary listener could not reasonably have understood the report to have been about criminal sexual abuse of a child. Any ordinary listener would have known that a network television broadcast about a physician's criminal sexual abuse of a child would have said so in no uncertain terms and not left the listener to wonder.

Toledo argues that the broadcast should not have mentioned she was a pediatrician when the press release did not. But that fact was included in the order to which she agreed, which was available on the Board's website, and which did not give the age of the patient at issue. Toledo

---

[25] The dissent "neither agree[s] nor disagree[s]" with this holding, *post* at ___, and complains that we have analyzed the issue "too brusquely", *post* at ___, and have not adequately considered various "complexities", *post* at ___. But if the dissent disagreed with our constitutional analysis, surely it would say so and not simply tease. The dissent considers our holding "irrelevant", *post* at ___, but also states that "Toledo bore the burden to prove that the broadcasts' gist was more damaging to her reputation than a truthful broadcast would have been", *post* at ___.

argues that KBMT's omission of the fact that she had prescribed testosterone and human growth hormone made the report misleading. But this assumes that an ordinary listener would think that such drugs are given only to adults when in fact they can also be given to children.[26] Toledo contends that the evidence shows that ordinary listeners were misled. But that evidence was her affidavit which, besides being self-serving, was conclusory hearsay. Just last year we held that such "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the [Act]."[27] She stopped short of identifying any ordinary listener who understood from the broadcast that she had engaged in a sexual relationship with a pediatric patient, stating only that it was "apparent" to her that her patients were "concerned".[28] Finally, Toledo argues that by changing the last of its four broadcasts to clarify that the patient referred to was an adult, KBMT itself acknowledged that the fair import of its report was to the contrary. But that change, apparently to make the report clearer, does not suggest that earlier broadcasts were misleading.

---

[26] *See* Andrew Calabria, *Male Hypogonadism in Children*, MERCK MANUALS (Oct. 2014), http://www.merckmanuals.com/professional/pediatrics/endocrine-disorders-in-children/male-hypogonadism-in-children (last visited June 16, 2016, copy in case file); Andrew Calabria, *Growth Hormone Deficiency in Children*, MERCK MANUALS (Oct. 2014), http://www.merckmanuals.com/professional/pediatrics/endocrine-disorders-in-children/-growth-hormone-deficiency-in-children (last visited June 16, 2016, copy in case file).

[27] *In re Lipsky*, 460 S.W.3d 579, 592 (Tex. 2015).

[28] Toledo's affidavit stated in pertinent part: "[M]y staff and I began receiving both personal and telephonic inquiries . . . . It was apparent from the content of the inquiries that my patients were concerned that I had been engaged in sexual contact with pediatric patients. . . . I was personally stunned by the content of these inquiries and horrified at the public response to these news broadcasts. . . . I also learned that patients had contacted other physicians, referral physicians and colleagues who knew me to inquire about these outrageously false representations. . . . Based upon the questioning I received from my peers, I am sure that my reputation in the medical community has suffered as a result of the rumors resulting from these broadcasts . . . ."

Most importantly, if there could have been any confusion over the broadcast, the same possibility of confusion existed in the Board's report of its proceedings. We have rejected Toledo's argument that the broadcast must be compared to the actual facts. It must instead be compared to the Board proceedings. The broadcast cast her in no worse light than the proceedings themselves.[29]

This case is unlike *Neely v. Wilson*.[30] There, a surgeon complained of a seven-minute televised investigative report suggesting that he had been disciplined by the Texas Medical Board

_____

[29] The dissent repeatedly asserts that a broadcast of official proceedings of public interest cannot as a matter of law be substantially true if there is any possibility that an ordinary listener *could* (the dissent uses the word over 30 times) have misunderstood it to convey a falsehood. The practical effect of such a rule would, of course, be to chill media reporting of matters not only of concern to the public but critical to the public's understanding of, and confidence in, the working of their government. In any event, the dissent has mischaracterized the law. While we have sometimes said that substantial truth depends on what an ordinary listener *could* take from a report, we have just as often stated the test as what an ordinary listener *would* take. *See Neely*, 418 S.W.3d at 64 ("We determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it."); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) ("We have long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it."); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) ("The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to Jacobs' reputation, in the mind of the average listener, than a truthful statement would have been."); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987) ("The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement."); *Guisti v. Galveston Tribune*, 150 S.W. 874, 878 (Tex. 1912) ("'The question is not what construction the witnesses in the case may put upon the statement, but what is its reasonable and natural meaning in view of the facts and circumstances under which it was made as alleged in the petition.'. . . 'The question is, what effect would the publication have upon the mind of the ordinary reader?'"). The dissent attempts to argue that *Turner* and *Neely* used "could" when referring to a no-evidence standard of appellate review while recognizing that a plaintiff must ultimately prove what an ordinary listener "would" have understood from the broadcast. Those cases did no such thing. The standard of review has nothing to do with the elements of the cause of action. The dissent appears to agree that an element of the plaintiff's cause of action is proof that what an ordinary listener would have understood is false. The Act requires the plaintiff to establish that element by clear and specific evidence or suffer dismissal. Evidence of what an ordinary listener could have understood is not evidence of what the listener would have understood. The test for substantial truth and its application must be guided by the fact that "since '. . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive" . . . ,' only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 271–272 (1964)).

[30] 418 S.W.3d 52 (Tex. 2013).

10

for taking drugs and being under their influence while operating.[31] In fact, the Board had disciplined him only for self-prescribing drugs.[32] The wide-ranging broadcast was not confined to the Board's order and information from its proceedings.[33] By contrast, KBMT's broadcast was a simple, accurate, fair, and brief restatement of the Board's press release and the order to which Toledo had agreed.

Our decision in *McIlvain v. Jacobs* is controlling.[34] There, a television station reported that city employees were being investigated for doing private work on city time.[35] The employees sued for defamation, alleging that the report was false because the charges were false.[36] But the truth of the report, we held, was to be measured by the scope of the investigation, not by whether the misconduct being investigated could ultimately be proved.[37]

---

[31] *Id.* at 56–59.

[32] *Id.* at 66.

[33] *Id.* ("A reasonable view of the gist of the broadcast is that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances. . . . The Order disciplined Neely for prescribing himself dangerous drugs or controlled substances. It did not discipline Neely for *taking or using* dangerous drugs or controlled substances." (emphasis in original)).

[34] 794 S.W.2d 14 (Tex. 1990).

[35] *Id.* at 15.

[36] *Id.*

[37] *Id.* at 16.

Since Toledo failed to present evidence establishing a prima facie case that KBMT's report was false, which is an element of her defamation claim, the Act requires that her action be dismissed. Accordingly, we reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.[38]

Nathan L. Hecht
Chief Justice

Opinion delivered: June 17, 2016

---

[38] *See* TEX. CIV. PRAC. & REM. CODE § 27.009(a) ("If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party: (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require[.]").