The DALLAS MORNING NEWS, INC.
and Kevin Krause, Appellants

v.

Lewis HALL and Richard Hall, Individ-
ually and on behalf of RXpress Phar-
macies and Xpress Compounding, Ap-
pellees

NO. 02-16-00371-CV

Court of Appeals of Texas,
Fort Worth.

DELIVERED: May 25, 2017

ATTORNEYS FOR APPELLANTS: THOMAS S. LEATHERBURY, MARC A. FULLER, KIMBERLY R. MCCOY, MARGARET D. TERWEY, VINSON & ELKINS L.L.P., DALLAS, TEXAS.

ATTORNEYS FOR APPELLEES: ROBERT J. MYERS, JOHN J. SHAW, MYERS LAW, FORT WORTH, TEXAS.

PANEL: WALKER, MEIER, and GABRIEL, JJ.

## OPINION

### BILL MEIER, JUSTICE

### I. INTRODUCTION

A private individual who sues a media defendant for defamation over statements of public concern bears the burden to prove that the statements are false, or not substantially true. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986); *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 711, 713-15 (Tex. 2016). In this interlocutory appeal from the denial of a motion to dismiss under the Texas Citizens' Participation Act (TCPA), we must determine whether Appellees Lewis Hall and Richard Hall, individually and on behalf of RXpress Pharmacies and Xpress Compounding, established by clear and specific evidence a prima facie case that Appellants The Dallas Morning News, Inc. and Kevin Krause published false statements about Appellees and their pharmaceutical compounding business. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(a), .005(c) (West 2015), § 51.014(a)(12) (West Supp. 2016). Because we conclude and hold that Appellees met their burden, and because Appellants' other issue is unpersuasive, we will affirm.

### II. BACKGROUND

#### A. Appellees

Lewis has been a state-licensed pharmacist for forty-three years. His son, Richard, has worked in the pharmacy business for most of his adult life and has operated Lewis's pharmaceutical business "over the years."

In 2013, Lewis and Richard formed a "partnership/joint venture" with Scott Schuster and Dustin Rall. Lewis handles the pharmaceutical responsibilities, and Richard, Schuster, and Rall manage the operations, sales, and marketing aspects of the venture. The business entails several entities, including RXpress Pharmacies and Xpress Compounding (collectively RXpress).

#### B. Compounding Pharmacies

RXpress is a compounding pharmacy. According to the U.S. Food and Drug Administration, compounding "is a practice in which a licensed pharmacist ... combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[1] Recent years saw

---

1. For example, a patient may require a compounded drug because she is allergic to a

a surge in the popularity of compounded medications and correlating growth in the compounding pharmacy industry—including the revenues that it generated. RXpress was no exception; after its formation, the business "thrived and made substantial profits."

The success enjoyed by the compounding industry, however, has not been immune from controversy, or consequences. Allegations of abusive marketing and exorbitant prices have circulated, pharmacy benefit managers have responded to sharply increased spending on compounded medications by discontinuing coverage for compounding ingredients, and the federal government has investigated and prosecuted compounding pharmacies for violating federal anti-kickback laws and defrauding Tricare—the health-insurance program for active and retired military personnel and their families. One such high-profile prosecution involved two North Texas men who were accused of engaging in a complex, conspiratorial kickback scheme that bilked Tricare out of $65 million.[2]

### C. Prior Litigation

Appellees have been involved in a number of recent lawsuits that are relevant to the primary issue in this appeal. In September 2015, RXpress sued Ruth E. Haynes, its former accountant, for falsely representing that she was a certified public accountant and for advising RXpress in such a way as to cause it to incur over $12 million in unnecessary federal income taxes.

Appellees sued Schuster and Rall, their business partners, in January 2016 for fraud, theft, breach of fiduciary duty, and other torts, alleging, among other things, that their partners had misled them regarding the purchase of an in-state pharmacy and had wrongfully diverted millions of dollars of partnership property to themselves.

The same month, Xpress Compounding sued Prime Therapeutics, LLC, a pharmacy benefit manager, for a declaration that Prime was not entitled to terminate Xpress Compounding from Prime's pharmacy network.

In February 2016, Ancillary Medical Services Management, LLC sued Appellees for breach of fiduciary duty and other torts involving Ancillary's investment in RXpress.

### D. *The Dallas Morning News* Articles

In February and March 2016, Krause authored, and *The Dallas Morning News* published, a series of articles that largely centered around the potentially illegal business practice in which compounding pharmacies financially incentivize physicians to write prescriptions for their products and services. The first article, published on *The Dallas Morning News*'s website on February 5, 2016, stated that federal authorities were investigating RXpress, which had been "accused of paying illegal kickbacks to physicians for writing prescriptions"; explained that federal authorities were investigating other compounding pharmacies for alleged violations of federal law; and referenced the *Haynes* and

---

particular ingredient contained in a commercially available drug or because she is unable to swallow a pill and requires the medicine in liquid form.

**2.** A *Wall Street Journal* article reported that Tricare paid $1.75 billion for compounded drugs in its fiscal year 2015—eighteen times

more than it paid during its fiscal year 2012. One person attributed the increase to fraud. Another reasoned that physicians had been increasingly turning to compounded pain creams as an alternative to potentially addictive opioid pain pills.

*Schuster/Rall* litigation. The article was republished in the print edition of *The Dallas Morning News* the following day.

On February 9, 2016, *The Dallas Morning News* published an article online that reported on Texas's apparent effort to crack down on illegal relationships between compounding pharmacies and physicians (in the form of a then-new state law that allows regulators to inspect a pharmacy's financial records). The article stated that "RXpress Pharmacy, of Fort Worth, is currently being investigated for possible violations of the anti-kickback law by the Department of Defense due to its use of Tricare money." Slightly revised articles were published online on February 10, 2016, and in print on February 11, 2016. Both articles contained a substantially similar statement about RXpress.

On February 24, 2016, *The Dallas Morning News* published an article online that reported on the arrest of the two North Texas men who had been indicted for defrauding Tricare out of $65 million. Referring to RXpress, the article stated that "*The Dallas Morning News* recently reported that a Fort Worth compounding pharmacy is under investigation in connection with similar allegations."

And finally, on March 11, 2016 online and on March 13, 2016 in print, *The Dallas Morning News* published an article that reported on Prime's decision to terminate Xpress Compounding from its network. The articles, which referenced the *Prime*, *Haynes*, and *Ancillary* litigation, led with the following statement, "A North Texas drug compounding business that's the subject of a federal health care fraud investigation was recently thrown out of a private health insurance network over suspicions of fraud, court records show."

**E. This Lawsuit**

Four days after the final article was published, Appellees sued Appellants for libel. Appellees alleged that Appellants had defamed them by publishing statements that Appellees were "under investigation by authorities concerning violation of criminal statutes" and by publishing statements that accused Appellees of defrauding the federal government, insurance providers, or both. Appellants timely moved to dismiss Appellees' claims under the TCPA. Regarding Appellees' under-investigation claim, Appellants argued that Appellees could not meet their burden to establish that Appellants had falsely reported that Appellees were under federal investigation. Regarding Appellees' defrauding claim, Appellants argued that the articles had merely reported on third-party allegations that had been lodged against Appellees in the *Haynes*, *Prime*, *Schuster/Rall*, and *Ancillary* lawsuits and that Appellees could not meet their burden to establish that Appellants' coverage of those third-party allegations was false and not privileged. The trial court denied Appellants' motion to dismiss and objections to Appellees' evidence.

### III. THE TCPA

■ The TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). Its purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002 (West 2015).

■ Under the TCPA's two-step dismissal process, the initial burden is on the defendant-movant to show by a preponderance of the evidence that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise of,"

among other things, the right of free speech. *Id.* § 27.005(b). If the movant satisfies this burden, the second step shifts the burden to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). "[C]lear and specific evidence" requires a plaintiff to "provide enough detail to show the factual basis for its claim." *Lipsky*, 460 S.W.3d at 591. A "prima facie case" means "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* at 590 (quoting *In re E.I. Dupont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)).

We review de novo a trial court's ruling on a motion to dismiss under the TCPA. *United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 511 (Tex. App.—Fort Worth 2014, no pet.). We consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a) (West 2015).

## IV. APPELLEES' BURDEN TO ESTABLISH FALSITY ELEMENT

There is no dispute that the TCPA applies to Appellees' libel claims. The only dispute is whether Appellees met their burden to establish the falsity element of their defamation claims. Specifically, in what we construe as their first of two issues, Appellants argue that Appellees failed to establish by clear and specific evidence a prima facie case (1) that Appellants falsely reported that Appellees were under federal investigation and (2) that Appellants falsely reported allegations that were made against Appellees in other civil lawsuits—that Appellees had defrauded the federal government, private insurers, or both.

"The United States Supreme Court and [the Supreme Court of Texas] long ago shifted the burden of proving the truth defense to require the plaintiff to prove the defamatory statements were false when the statements were made by a media defendant over a public concern," just like we have here. *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013). Thus, one element of Appellees' defamation claims—in fact, the only element that Appellants challenged in their motion to dismiss—is that Appellants published a false statement. *See D Magazine Partners, L.P. v. Rosenthal*, No. 15-0790, —— S.W.3d ——, ——, 2017 WL 1041234, at *3 (Tex. Mar. 17, 2017).

In approaching the question of falsity, the common law of libel "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447 (1991). Therefore, as long as a statement is substantially true, it is not false.[3] *Toledo*, 492 S.W.3d at 714. Logically then, courts utilize the substantial-truth doctrine in determining the truth or falsity of a defamatory publication. *Neely*, 418 S.W.3d at 63. A publication's truth or falsity depends on whether the gist of the publication was more damaging to the plaintiff's reputation than a truthful or accurate publication would have been. *D Magazine*, —— S.W.3d

---

**3.** And vice versa. Evidence that a challenged statement is *not* substantially true evidences falsity. *See Toledo*, 492 S.W.3d at 711 ("The First Amendment requires that a private individual who sues a media defendant for defamation over statements of public concern bear the burden of proving that the statements were false—that is, that the gist of the statements was not substantially true."); *see also D Magazine*, —— S.W.3d at ——, 2017 WL 1041234, at *9.

at ——, 2017 WL 1041234, at *4; *Neely*, 418 S.W.3d at 63 ("[I]f a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable."). We determine a publication's gist by construing the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *see D Magazine*, —— S.W.3d at ——, 2017 WL 1041234, at *4.

## A. Appellees' Under-Investigation Claim

### 1. Gists

The title of the February 5, 2016 article, published online in the "Investigations" section of *The Dallas Morning News*'s website, states in part, "North Texas pharmacy in federal probe." The first sentence of the article likewise states in part that "[f]ederal authorities are investigating a North Texas compounding pharmacy." The article then mentions RXpress, effectively identifying RXpress as the pharmacy referred to in both the title and the first sentence. The remaining part of the title states that the pharmacy is "accused of paying kickbacks to doctors," while the remaining part of the first sentence similarly states that the pharmacy is "accused of paying illegal kickbacks to physicians for writing prescriptions, according to court documents obtained by *The Dallas Morning News*." The article goes on to state the following:

- federal authorities are conducting multistate criminal and civil investigations into "similar" claims;
- "The scope and nature of the investigation involving RXpress are unclear";
- the "fraud investigations are the latest blow to compounding pharmacies, which have already been subjected to intense federal scrutiny";
- Tricare had recently stopped paying for compounded pain creams "so that federal authorities could investigate fraud suspicions";
- federal authorities had recently "raided nine compounding pharmacies in Mississippi and seized more than $15 million in assets";
- several Florida pharmacies had agreed "to pay millions to settle civil allegations that they had improper financial relationships with doctors";
- "The [federal] anti-kickback law protects patients from 'inappropriate medical referrals or recommendations by health care professionals who may be unduly influenced by financial incentives'"; and
- "The federal Stark law prohibits physicians from referring Medicare and Medicaid patients to a health care company if the physician or an immediate family member has a financial relationship with the company."

The article specifically references fraud-related allegations contained in the *Haynes* and *Schuster/Rall* pleadings. The February 6, 2016 print edition contains a different title but conveys the same message as the February 5, 2016 online article. Certainly, a person of ordinary intelligence could conclude that the gist of the publications was that RXpress was under federal investigation for violating criminal laws aimed at prohibiting fraud in the healthcare context, including Tricare.

The February 9, 2016 article, which was republished and slightly revised on February 10 and 11, 2016, carried forward the same federal-fraud-investigation storyline that the February 5 and 6, 2016 articles

spawned.[4] The following statements surround the statement that "RXpress Pharmacy, of Fort Worth, is currently being investigated for possible violations of the anti-kickback law by the Department of Defense due to its use of Tricare money":

- "Physician ownership and investment in compounding pharmacies is starting to get more attention and scrutiny with an expanding federal investigation of kickbacks in Texas and other states."
- "Investigators want to know if compounding pharmacies are illegally paying doctors to write prescriptions for their products and services, including pain creams and DNA tests."
- "Federal authorities usually target cases of fraud that are in the tens of millions of dollars involving federal health insurance programs like Medicare and Tricare, which is for the U.S. military."
- "But for schemes on a smaller scale, Texas regulators now have their own weapon."

The words in light blue font were hyperlinked to the February 5, 2016 article. The article repeats the statements about the "federal anti-kickback law" and the "federal Stark law" that were contained in the previous articles. Although placing more emphasis on Texas's effort to curb alleged improper relationships between compounding pharmacies and physicians, once again, a person of ordinary intelligence could conclude that one gist of the publications was that RXpress was under federal investigation for violating criminal laws aimed at prohibiting fraud in the healthcare context, including Tricare. *See Neely*, 418 S.W.3d at 68 ("One gist of the KEYE broadcast we have not previously addressed is . . . .").

We reach a similar conclusion regarding the February 24, 2016 article. Published on Krause's online "Crime Blog," it reports that two North Texas men—with no connection to Appellees—were arrested, or "busted," for an alleged kickback scheme to defraud Tricare out of $65 million. The article largely discusses the intricate details of their scheme but also states that *"The Dallas Morning News* recently reported that a Fort Worth compounding pharmacy is under investigation in connection with *similar* allegations."[5] [Emphasis added.] Straddling that statement are the following two statements:

- "It is the first federal indictment in North Texas in connection with the government's large-scale criminal investigation into compounding pharmacies and their marketing operations that have received Tricare money."
- "And it highlights continuing problems with compounding pharmacies—particularly in the Dallas area—that have quickly grown into lucrative drug distribution operations without proper oversight."

A person of ordinary intelligence could conclude that one gist of the article is that federal investigators were cracking down on fraud in the compounding pharmacy industry, including in North Texas, not only by making arrests but also by continuing to investigate compounding pharmacies, including RXpress.

Finally, the March 11 and 13, 2016 articles essentially reinforce Appellants' repeated allegations that Appellees were under federal investigation for fraud by reporting on the *Prime* lawsuit, regurgitating previous statements about the *Haynes* and *Schuster/Rall* lawsuits, and

---

**4.** The February 9, 2016 article was published on Krause's online "Crime Blog."

**5.** The words in light blue font were hyperlinked to the February 5, 2016 article.

repeating that federal authorities were performing multistate investigations into compounding pharmacies. The articles state that "[a] North Texas drug compounding business that's the subject of a federal health care fraud investigation was recently thrown out of a private health insurance network over suspicions of fraud, court records show"; use the headings "Fraud suspected" and "Kickback allegations"; and conclude by stating that "[q]uestions have been raised in Texas and nationally about business relationships between doctors and pharmacies. Federal law prohibits pharmacies from giving physicians anything of value in exchange for prescription referrals." Both articles contain a color photograph of the Halls, Schuster, and Rall sporting sharp suits and wide grins. An ordinary person could conclude that the gist of the publications was that RXpress was under federal investigation for violating criminal laws aimed at prohibiting fraud in the healthcare context.

## 2. Substantial Truth of Gists

■ Appellants assert no argument to contradict our gist determinations above, probably because the gists are so overwhelmingly apparent. Appellants do, however, argue that Appellees are unable to meet their burden to show that the articles' gists are not substantially true because the reports that Appellees were under federal investigation were "literally" true. Appellants' argument hinges upon one piece of evidence: a search warrant that federal agents working for the Defense Criminal Investigative Service of the U.S. Department of Defense executed on February 5, 2016, at the residence of Nathan Halsey, an individual who according to Appellees, had unsuccessfully sought employment with RXpress in the past.

Issued by a magistrate in the Northern District of Texas on February 4, 2016, the search warrant identified the location to be searched as a single-family residence located in University Park, which according to Appellants was owned by Halsey, and also identified the items to be searched for and seized as "all communications" between "Nathan Halsey, Britt Hawrylack, Matthew Hawrylack, Dustin Rall, Scott Schuster, Richard Hall, Lewis Hall, Jr., and any other associate of Rxpress Pharmacy, Rxpress Laboratories, Tactical Health Care Partners, and Tiger Racing Team that" related to, among other things, "the submission of claims for reimbursement for any health care service, prescription drug, or testing, or the facilitation of payment to recruiters, marketers, doctors, beneficiaries or others for referral to Rxpress Pharmacy, Rxpress Laboratories, Tactical Health Care Partners, and Tiger Racing Team." The search warrant also sought all communications that "show or demonstrate connections or relationships such as ownership, control, responsibility, direction, or authorization within Rxpress Pharmacy, Tactical Health Care Partners, and Tiger Racing Team."

Appellants argue that the search warrant "leaves no room for any doubt that Appellees were under federal investigation." This is where Appellants' argument goes wrong. The search warrant affidavit is not in evidence, and although the search warrant certainly mentions Appellees, it also mentions other individuals and entities and expressly permits the government to search and to seize Halsey's property, not Appellees' property. We disagree with Appellants' implied argument that the search warrant *conclusively* establishes that Appellees were under federal investigation. Rather, that Appellees were under federal investigation is but one reasonable *inference* to be drawn from the four corners of the search warrant. And impor-

tantly, while it certainly may be reasonable to infer that Appellees were under federal investigation, that is not the only reasonable inference to be drawn. An equally reasonable, if not much stronger, inference is that *Halsey* was under investigation by the federal government, *not Appellees*.

 The question then is how must a trial court handle evidence from which competing reasonable inferences may be drawn in determining whether the non-movant met its burden to establish by clear and specific evidence a prima facie case for a challenged element? The answer is simple. Clear and specific evidence includes relevant circumstantial evidence and the rational inferences that may be drawn therefrom. *Lipsky*, 460 S.W.3d at 584, 591. There can be no doubt that the trial court's role is not to act as a factfinder and *to resolve* opposing reasonable inferences—as Appellants would have it—but instead, to determine whether the non-movant met its burden *to produce* evidence sufficient to meet its burden under the TCPA, some of which may include relevant evidence from which more than one reasonable inference may be drawn. *Cf. City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005) (reasoning that *the factfinder* is responsible for resolving conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts); *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (Phillips, C.J., concurring and dissenting) ("Circumstantial evidence often requires *a fact finder* to choose among opposing reasonable inferences.") (emphasis added); *see also Lipsky*, 460 S.W.3d at 589 ("That the statute should create a greater obstacle for the plaintiff to get into the courthouse than to win its case seems nonsensical."). The trial court properly rejected Appellants' faulty search-warrant argument.

Turning to whether Appellees met their burden, notwithstanding that the search warrant is itself some evidence that Appellees were not under federal investigation, Richard Hall affirmed in his affidavit that Appellees were not under federal investigation:

These articles falsely claimed that RXpress, me and my father were under federal investigation for crimes similar to those perpetrated by others in the compounding industry and left the reader with the impression that our business was conducted in the same fraudulent fashion and that it was likely that our business would suffer fates similar to the others, including public "raids", arrests of the principals, and seizure of business and personal assets.... These statements were materially false. Neither us, nor the pharmacy, are under any sort of federal investigation....

*See Neely*, 418 S.W.3d at 67 (reasoning that plaintiff produced some evidence to show that gist of broadcast was not substantially true by swearing to opposite of gist in affidavit).

Appellants argue that Richard's affidavit established only that he and Lewis were not *personally aware* of any federal investigation, which is different from actually *being* under investigation, and in what we construe as their second issue, Appellants relatedly argue that Richard's testimony was outside of his personal knowledge. The arguments lack any merit. We seriously doubt that Richard spent his days locked in a dark room, ears muffled, hands covering his eyes, blocking out all contact with the rest of the world. As the part-owner of a successful multi-million dollar business, heavily involved in and responsible for its day-to-day operations, with his ear to the ground, Richard was more than competent to offer such testimony, which was neither conclusory nor outside his personal knowl-

.. 

edge. *Stone v. Midland Mutifamily Equity REIT*, 334 S.W.3d 371, 375 (Tex. App.— Dallas 2011, no pet.) ("An affiant's position or job responsibilities can qualify the affiant to have personal knowledge of facts and establish how the affiant 'learned of the facts."). The trial court did not abuse its discretion by overruling Appellants' objections to this portion of Richard's affidavit.[6] We overrule this part of Appellants' second issue.

Richard also stated in his affidavit that the articles published by *The Dallas Morning News* "caused [the Halls] and the pharmacies significant monetary damage and harm. Almost immediately after the publication of the first two articles, RXpress's prescription volume fell from several hundred per day to less than a dozen, a circumstance which has continued since the first publications."[7] [Footnote omitted.] And Appellees submitted the affidavit of Shaun Kretzschmar, a physician who had utilized RXpress's services for several years.[8] He stated,

I recently terminated any new prescriptions, changed, and transferred previous prescriptions from RXpress to other pharmacies. My decision was directly due to the rumors and criminal allegations that *The Dallas Morning News* published in a series of articles earlier this year. I felt that in the current microscopic scrutiny of medical practice, as well as RXpress' apparent unethical and criminal practices, it was in the best interests of patient care and my practice to sever all ties with them.

Appellees presented clear and specific evidence that they were not under federal investigation and that RXpress experienced adverse business-related effects immediately after the challenged articles were published. Because Appellees' evidence demonstrates that the gists of the publications were more damaging to their reputation than a truthful publication would have been, Appellees met their burden to establish a prima facie case that the gists of the publications were not substantially true. *See D Magazine*, —— S.W.3d at ——, 2017 WL 1041234, at *4. The trial court properly denied Appellants' motion to dismiss Appellees' under-investigation claim. We overrule this part of Appellants' first issue.

## B. Appellees' Defrauding Claim

Regarding Appellees' claim that Appellants defamed them by publishing statements that accused Appellees of defrauding the federal government or insurance providers, Appellants contend that the publications were privileged under either the statutory judicial-proceedings privilege or what Appellants refer to as the "Third-Party Allegations Rule" because they merely reported allegations made by others in civil lawsuits and because Appellees submitted no clear and specific evidence that the reports were false. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.002(b)(1)(A), 73.005(b) (West 2017).

 Under the statutory judicial-proceedings privilege, the publication of "a

---

**6.** Appellants also objected that the first sentence of Richard's affidavit above was "improper meaning testimony," but his statement is consistent with the gists that we determined above. The trial court did not abuse its discretion by overruling Appellants' objection. We overrule this part of Appellants' second issue.

**7.** Appellants objected to this part of Richard's affidavit as hearsay, but the trial court could

have reasonably concluded that as a co-owner of RXpress, Richard based his testimony on personal knowledge. The trial court did not abuse its discretion by overruling Appellants' argument. We overrule this part of Appellants' second issue.

**8.** Appellants did not object to Dr. Kretzschmar's affidavit.

fair, true, and impartial account of" "a judicial proceeding" by a "newspaper or other periodical" is "privileged and is not a ground for a libel action." *Id.* § 73.002(a), (b)(1)(A). In a case in which the burden has shifted to the plaintiff to prove falsity, as in this case, although the defendant bears the burden to prove that the privilege is applicable, the plaintiff retains the burden to prove that the gist of the publication was not substantially true—that is, that the publication was not a fair, true, and impartial account of the proceedings. *See Toledo,* 492 S.W.3d at 714-15. "[T]he gist of an allegedly defamatory [publication] must be compared to a truthful report of the [judicial proceedings], not to the actual facts." [9] *Id.* at 714.

Civil practice and remedies code section 73.005(a) provides that truth is a defense to a claim for defamation. Tex. Civ. Prac. & Rem. Code Ann. § 73.005(a). Recently added section 73.005(b) clarifies that "[i]n an action brought against a newspaper or other periodical or broadcaster, the defense described by Subsection (a) applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." *Id.* § 73.005(b). Although falsity is an element of Appellees' claim, as opposed to truth being a defense to be proved by Appellants, there is no reason why section 73.005(b) would not otherwise apply.

Therefore, under either the judicial-proceedings privilege or the "Third-Party Allegations Rule," Appellees bore the burden to submit clear and specific evidence that the statements which Appellants published accusing Appellees of defrauding the federal government or insurance providers were not substantially true.

### 1. Gists

Appellees' defrauding claim implicates the February 5 and 6, 2016 articles, which referenced the *Haynes* and *Schuster/Rall* lawsuits, and the March 11 and 13, 2016 articles, which referenced the *Prime, Haynes,* and *Ancillary* lawsuits.

In addition to statements about federal investigations into compounding pharmacies for suspected fraud, including some that had "already resulted in indictments and multimillion-dollar civil settlements," the February 5 and 6, 2016 articles stated the following:

- "RXpress Pharmacy and related entities in the Dallas area also paid sales reps commissions to market the pharmacy's services to doctors in apparent violation of federal anti-kickback laws, according to lawsuits";

- "The lawsuits and investigations raise legal and ethical questions about business relationships between doctors and pharmacies";

- "The kickback allegations surfaced when RXpress Pharmacy sued its accountant . . . .";

- "Disgruntled business partners and a pharmacy tax adviser leveled the accusations against RXpress in separate lawsuits. The tax adviser said doctors invested in the pharmacy and wrote prescriptions to drum up business for the company. RXpress

---

**9.** We have concerns whether the statutory judicial-proceedings privilege covers statements contained in pleadings. Although the absolute judicial-proceedings privilege no doubt covers pleadings, *see Daystar Residential, Inc. v. Collmer,* 176 S.W.3d 24, 28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), we have located only one nonbinding case stating that the statutory judicial-proceedings privilege does as well. *See Langston v. Eagle Publ'g Co.,* 719 S.W.2d 612, 624 (Tex. App.—Waco 1986, writ ref'd n.r.e.). Nevertheless, we proceed to consider falsity.

paid them kickbacks in the form of investor dividends, she said."

The articles contain additional, more detailed statements about the *Haynes* and *Schuster/Rall* lawsuits under the heading, "Lawsuits." Seeing the juxtaposition of the fraud-related accusations levied by current or former business associates with whom Appellees were embroiled in litigation against the reports that federal authorities were investigating compounding pharmacies for fraud, a person of ordinary intelligence could conclude that the gist of the publications was that like the compounding pharmacies that had been accused of wrongdoing by the federal government, Appellees had violated federal laws aimed at prohibiting fraud in the healthcare context.

The March 11 and 13, 2016 articles explain that federal authorities are investigating compounding pharmacies for fraud, repeat statements about the *Haynes* lawsuit under the heading "Kickback allegations," and include several statements about the *Ancillary* litigation under the same "Kickback allegations" heading. Regarding the *Prime* lawsuit, the articles state the following under the heading "Fraud suspected":

- "Prime Therapeutics removed [RXpress Pharmacy and Xpress Compounding] from its network after saying it discovered problems. Prime said it found errors in 91 percent of Xpress's claims, court records show";
- "Most of the products Xpress billed the network for are not FDA-approved, court records said. And most of the noncompounded products it billed for were 'high-cost, topical pain products,' records said";
- "Xpress did swift business after joining the Prime network in 2014, according to its lawsuit. In October,

the pharmacy submitted 39 claims worth $20,509. By December, its claims were up to 1,187 for a total of $369,123";

- "'That caught the attention of Prime's 'Fraud, Waste and Abuse team'";
- "The resulting audit revealed that Xpress' practices included dispensing prescriptions in 'incorrect quantities or dosages' and refilling prescriptions that were 'not properly authorized,' the lawsuit said";
- "Prime said that Xpress' invoice shortages suggest the pharmacy was seeking reimbursement for drugs that were either never purchased, bought at a lower price or bought from unlicensed sources";
- "'The first two are indicative of fraudulent billing, and the third is not just unlawful but raises serious public safety concerns,' Prime Therapeutics said in the lawsuit";

The heading of the online version of the article is "North Texas compounding pharmacy under federal scrutiny was booted from private network over fraud concerns." The heading of the print edition is "Pharmacies booted over fraud concerns." Again, the juxtaposition of fraud-related accusations levied by current or former business associates with whom Appellees were embroiled in litigation against reports that federal authorities were investigating compounding pharmacies for fraud, coupled with the reference to Prime's decision to terminate Xpress from its network for "fraud concerns," could have caused a person of ordinary intelligence to conclude that the gist of the publications was that like the compounding pharmacies that had been accused of wrongdoing by the federal government, Appellees had violated federal laws aimed at prohibiting fraud in the healthcare context.

### 2. Substantial Truth of Gists

Appellants compare the complained-of statements against their respective sources and argue that the challenged articles accurately reported the third-party allegations. Although we properly compare the gists of the articles against the proceedings from which the statements originated, we disagree that Appellees failed to meet their burden to show falsity. Texas recognizes that "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Turner*, 38 S.W.3d at 115 (expressly observing claim for "defamation based on a publication as a whole," i.e., defamation by implication). This is precisely what Appellants accomplished here.

Regarding the *Prime* lawsuit, after experiencing a sharp increase in the number of claims that Xpress submitted in late 2014, Prime audited Xpress, found "billing violations and inaccuracies," and notified Xpress that it would be terminated from Prime's pharmacy network. Xpress sued Prime for a declaration that Prime was not entitled to terminate Xpress from Prime's network. In its brief opposing Xpress's motion for a preliminary injunction, Prime argued that it had decided to terminate Xpress from its network because its audit revealed, among other things, invoice shortages, billing for an improper manufacturer's product number, and dispensing and submitting for payment drugs that have not received FDA approval. Prime argued that the audit findings "are consistent with and raise significant concerns of fraud, or at a minimum, inaccurate record keeping." However, viewed in context, the alleged "fraud" of which Prime referenced was of the accounting type, not the federal

healthcare type. Indeed, in its order denying Xpress's motion for a preliminary injunction, the district court stated that "[a]ccording to Prime, the result of the audit raised suspicions of fraudulent billing." An objective review of the *Prime* pleadings reveals that the lawsuit had nothing to do with Appellees' alleged commission of federal healthcare fraud.

Regarding the *Schuster/Rall* lawsuit, Appellees initiated the litigation because Schuster and Rall had allegedly wrongfully diverted millions of dollars of partnership property to themselves. The statements that are referenced in the February 5 and 6, 2016 articles are from a pleading that *Appellees* filed in opposition to a motion to compel arbitration. Objectively viewed, the lawsuit involves a business dispute between partners over money. If it has anything to do with the commission of federal healthcare fraud, the relation is, at most, tangential.

And finally, RXpress sued Haynes for falsely representing that she was a certified public accountant and for causing RXpress to unnecessarily incur millions of dollars in federal income taxes. The statements that are referenced in the challenged articles are from a lengthy, rambling response to RXpress's request for disclosure, in which Haynes attempted to counter RXpress's allegation that she had provided faulty tax advice. Like the *Schuster/Rall* lawsuit, if the *Haynes* lawsuit has anything to do with the commission of federal healthcare fraud, the relation is, at most, tangential.

Comparing the gists of the articles against the proceedings from which the statements originated reveals that Krause (1) selectively incorporated into the challenged articles fraud-related statements from lawsuits that had either nothing, or largely nothing, to do with federal healthcare fraud and (2) juxtaposed those state-

ments against reports that federal authorities were investigating compounding pharmacies for potential federal healthcare fraud, some of which had already led to indictments and million-dollar civil settlements, which effectively (3) created a gist that cast Appellees in a worse light than the proceedings the source of the allegations themselves. *See Toledo*, 492 S.W.3d at 714-15; *Turner*, 38 S.W.3d at 115. Appellees met their burden to establish a prima facie case that the gist of the publications was not substantially true. *See D Magazine*, —— S.W.3d at ——, 2017 WL 1041234, at *4. The trial court properly denied Appellants' motion to dismiss Appellees' defrauding claim. We overrule the remainder of Appellants' first issue.

## V. EVIDENTIARY OBJECTIONS

In what we construe as their second issue, Appellants argue that the trial court erred by overruling their objections to the evidence that Appellees submitted in response to the motion to dismiss. Having already overruled Appellants' objections to the evidence that the trial court reasonably could have relied upon to deny Appellants' motion, any error in overruling Appellants' other objections was harmless. *See* Tex. R. App. P. 44.1. We overrule the remainder of Appellants' second issue.

## VI. CONCLUSION

Having overruled Appellants' two issues, we affirm the trial court's order denying Appellants' motion to dismiss.

WALKER and GABRIEL, JJ., concur without opinion.