Opinion issued August 12, 2021



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00844-CV

———————————

**DAVID AND CYNTHIA DRERUP, Appellant**

**V.**

**THOMAS AND KAREN MCQUILLING, Appellee**

---

On Appeal from the 151st District Court
Harris County, Texas
Trial Court Case No. 2019-75440

---

## MEMORANDUM OPINION

During Tropical Storm Imelda, David and Cynthia Drerup's Houston home flooded from rising waters. The Drerups sued their neighbors, Thomas and Karen McQuilling, alleging in their petition that a wood fence and "a concrete wall" on the

McQuillings' property had, in violation of the Texas Water Code and common law, diverted the natural flow of surface waters, leading to the flooding of their home.

The McQuillings counterclaimed against the Drerups, suing for defamation based on an email sent by Cynthia Drerup to a City of Houston employee about the flooding. In the email, Cynthia told the city employee that Thomas McQuilling had built "a long and high concrete double wall" behind his wood fence to prevent stormwater from entering his property and to block flood waters from draining from her street onto his property, resulting in Cynthia's street and her home flooding. Pointing out that Thomas was an executive with Kickerillo Homes, she stated that Thomas "did this on purpose, he knew as a home builder what he was doing, and he's put all of our homes in harm's way for repeated flooding."

The Drerups moved to dismiss the defamation claim pursuant to the Texas Citizens Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011.[1] The trial court denied the motion. The Drerups appeal, asserting in their sole issue that the trial court erred in denying their TCPA motion to dismiss.

We affirm.

---

[1] The Texas Legislature amended the TCPA effective September 1, 2019. Those amendments apply to "an action filed on or after" that date. Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 11, 2019 Tex. Sess. Law Serv. 684, 687. This lawsuit was filed on October 14, 2019. Thus, the TCPA as amended in 2019 applies to this action.

## Background

On August 16, 2019, the Drerups purchased their home at 12419 Broken Arrow Street, which is a cul-de-sac. At the time of purchase, the sellers disclosed in writing to the Drerups that the home had flooded during storms in 2009 and in 2015 but indicated that the flooding issues on the street had been resolved in 2017 by the installation of a sliding gate at the end of the cul-de-sac. The gate could be opened by the street's residents to drain the street. The disclosure stated that after installation of the gate, the home did not flood during subsequent storms, including during Hurricane Harvey.

The McQuillings had purchased their property, at 12430 Taylorcrest Road, 30 years earlier in 1989. The eastern boundary of the McQuillings' property lies at the end of the Broken Arrow Street cul-de-sac. A solid wood fence on the McQuillings' property runs along that boundary at the end of the cul-de-sac. Behind the wood fence is a 22-inch-high concrete planter box, which was on the property when the McQuillings' purchased it.

On September 19, 2019, the month after the Drerups purchased their home, Tropical Storm Imelda dropped heavy rain on Houston. During the storm, the Drerups' home flooded. At that time, Cynthia waded to the end of cul-de-sac to investigate why the street was not draining. She broke out boards from the McQuillings' wood fence and saw what she later described as a "double cement

3

wall" on the other side of the fence in the McQuillings' yard. She also took photographs of what she saw.

A few days after the flood, Cynthia Drerup called the City of Houston to report a drainage problem on Broken Arrow Street. Desmone Kelley, a field supervisor in the city's Transportation and Drainage Operations, met with her. Cynthia later stated in a declaration that Kelley asked her "to email him a summary of what [she] knew" and to attach the photographs she had taken related to the flooding.

In two emails to Kelley, Cynthia attributed the flooding on her street to what she described as a "high concrete double wall along the entire [wood] fence" on the McQuillings' property. She stated that Thomas McQuilling had built the concrete wall "on purpose" to divert surface waters away from his property and to block stormwater from draining from Broken Arrow Street onto his property. Cynthia told Kelley that Thomas McQuilling was an executive with Kickerillo Homes. Her emails conveyed that Thomas had caused her street to flood by using his knowledge as a homebuilder to construct the concrete wall to protect his property from flooding by blocking the stormwater from draining from Broken Arrow Street onto his property.

Cynthia's initial email to Kelley was as follows:

From: C D
Sent: Tuesday, September 24, 2019 12:29 PM
To: desmone.kelley@houstontx.gov
Subject: Street Flooding Caused By Neighbor's Concrete Berm

Hello Mr. Kelley,

Thank you for coming today to meet me at our new house at 12419 Broken Arrow Street, 77024. We just bought the house a few weeks ago.

Below is a picture of the front of the house that is the problem: 12430 Taylorcrest Road.

The homeowner put a long and high concrete double wall along the entire back fence (which appears as a wood fence at the end of our cul de sac) to block the natural flow of storm water from our street through his yard to the drainage.

As I shared with you, during Thursday's rains last week, our entire street flooded quickly and could not reach the normal runoff location to the ditches to the west of our cul de sac ( Benignus Street I think) because the house owner at the end of our street (on the other side of the fence) built a very high and very long two wall concrete wall to block the normal flow of water so that it would not pass through his yard. The water was waist deep or more in front of my house on Broken Arrow street, and reached into my house and garage and many of the other neighbor houses. I'm told this homeowner is an executive at Kickerillo Homes. He did this on purpose, he knew as a home builder what he was doing, and he's put all of our homes in harm's way for repeated flooding.

On the next emails I'll send you flooding pictures.

Please call with any questions.

Thank You,
Cynthia Drerup

That same day, Cynthia sent a second email to Kelley stating,

Water rose quickly reaching my back door and into the garage on Thursday last week during rainstorm because the house owner at the end of our cul de sac (the direction the water flows) built a double wall concrete wall across his backyard fence line to block the natural flow of rainwater from passing thru his yard to reach the designated drainage system. He works for a home builder Kickerillo Homes. The problem house address is 12430 Taylorcrest Road.

Cynthia also forwarded photographs that she had taken during the flood to Kelley. This included a photograph of the wood fence at the end of the cul-de-sac, taken at that time. The photograph showed that many of the wooden pickets were

5

missing from the fence. Under the photograph, Cynthia wrote in her email to Kelley that she had knocked out the pickets to help the street drain. The photographs also showed portions of what she referred to as a "double cement wall."

In addition, Cynthia contacted the office of City Council Member, Greg Travis. Travis's constituent liaison, Danielle Davis, requested that Cynthia send her the emails that she had sent to Kelley, and Cynthia forwarded the emails to Davis. Cynthia also sent emails directly to Davis. In one email, Cynthia asked Davis the following question regarding Thomas McQuilling: "[W]hat happens next regarding requiring the bad man on cul de sac to tear down the walls he built (concrete/wood fence berm) that caused flooding?" Later that same day, Cynthia sent the following email to Davis, again referring to Thomas's construction of the wall and mentioning his position as an executive with Kickerillo Homes:

From: C D
Date: October 2, 2019 at 10:36:11 AM CDT
To: "Davis, Danielle - CNL" <Danielle.Davis@houstontx.gov>
Subject: Re: Street sweeper & Gutter Clean -12419 broken arrow street, 77024

Our house Has water inside the walls ... we only needed a few inches less and we would have been dry. I will send you the maps showing our street is the designated "evacuation route" for storm water surface runoff. And this guy built a double wall to block it ... cfo of Kickerillo homes ... willful misconduct.

On October 14, 2019, the Drerups sued the McQuillings, later amending their petition. In their amended petition, the Drerups claimed that their home had flooded because the wood fence and "a concrete wall approximately 2 to 3 feet high" behind the fence on the McQuillings' property had blocked "the natural flow of surface

6

waters." The Drerups alleged that, on the day of the flood, Cynthia had waded through waist-deep water to the end of cul-de-sac to determine the cause of the flooding:

> Cynthia Drerup observed that water was impounded in the Broken Arrow St. cul-de-sac due to the impenetrable wood fence and extremely wide concrete block wall constructed and maintained by [the McQuillings] that spans the entire width of the Broken Arrow St. cul-de-sac, in such a way that the water was trapped and rose higher on Broken Arrow St. instead of following its natural flow to the west.

They also alleged that Cynthia had observed that the McQuillings' backyard was free of floodwater. They asserted that the McQuillings had "constructed and continue to maintain the fence and wall for the purpose of diverting the natural flow of surface water away from their own property."

The Drerups brought claims against the McQuillings for negligence, nuisance, and trespass as well as for violating Texas Water Code section 11.086(a) by diverting the natural flow of surface waters. The Drerups sought damages to compensate them for their flooded home and for mental anguish. They also sought an injunction "to remove or alter [the McQuillings'] wall and fence in such a way that allows the natural flow of water." The Drerups later non-suited their Water Code claim.

The McQuillings answered the suit by generally denying the claims and asserting several affirmative defenses. The McQuillings also counterclaimed against the Drerups, seeking declaratory relief. The Drerups answered, filing a general denial. The McQuillings subsequently amended their counterclaim, adding a cause

of action for trespass. They also listed a cause of action for "Defamation Per Se and Defamation." Under this heading, they asserted that Cynthia had "published a statement of fact referring to Tom McQuilling that was defamatory and false" and had been "negligent with regard to the truth of the statement." They alleged that "Cynthia Drerup's statements injured Tom McQuilling in his profession as a homebuilder by imputing that he lacked a necessary skill peculiar or unique to the profession" and "injured Tom McQuilling's reputation in the community."[2]

As a basis for their defamation claim, the McQuillings made the following factual allegations:

> On September 24, 2019, Cynthia Drerup sent an email to Desmone Kelley, a Field Supervisor for the City of Houston, describing the events of the flooding. In this email, Cynthia Drerup also stated that Tom McQuilling built the wall behind his fence on purpose so that it would flood Broken Arrow Street. Cynthia Drerup further stated that, as a homebuilder and an executive at Kickerillo Homes, Tom McQuilling "knew . . . what he was doing, and he's put all of [their] homes in harm's way for repeated flooding." In fact, Tom McQuilling did not build the fence or the wall in question. These structures existed long before the McQuillings owned the home on Taylorcrest Road.

---

[2] In their live counterclaim pleading, both Thomas and Karen were counter-plaintiffs with respect to their claims for declaratory judgment and trespass. However, with respect to the defamation claim it is less clear whether only Thomas is a counter-plaintiff or whether Karen was also intended to be a counter-plaintiff. The parties refer to Thomas and Karen collectively as counter-plaintiffs and to David and Cynthia Drerup collectively as counter-defendants. The question in this interlocutory appeal is whether the trial court erred in not dismissing the defamation claim pursuant to the TCPA. Without more information in the record, we cannot determine who the intended or proper counter-parties are here. At this point and with the case in its early stages, that question is better left to the trial court. Thus, like the parties, we refer to each couple collectively and focus on the issue before us.

Furthermore, the structures did not cause the Drerup's house to be allegedly damaged. Therefore, Cynthia Drerup's statements are false and damaging to Tom McQuilling's reputation as a qualified and respectable homebuilder and as a member of the same community.

The McQuillings also moved for partial summary judgment on the Drerups' claims and on two of their own counterclaims—declaratory judgment and trespass— but they did not seek summary judgment on their defamation claim. The trial court granted summary judgment to the McQuillings on the Drerups' claims but denied the motion with respect to the McQuillings' counterclaims.

The Drerups filed a motion to dismiss the McQuillings' defamation counterclaim pursuant to the TCPA, later amending the motion. The Drerups asserted that the defamation claim was based on or in response to Cynthia's exercise of her right of free speech. The Drerups claimed that Cynthia's first email to Kelley, on which the defamation claim was based, was "made in connection 'with a matter of public concern.'" They asserted that "the matter of public concern was the street and home flooding Ms. Drerup witnessed on Broken Arrow Street." They stated that, "after the Harvey, Imelda, Tax Day, Memorial Day, Ike, and Allison storms, no one [can] seriously argue[] that flooding in Houston is not a matter of public concern or a matter of great interest to the community."

The Drerups also asserted that Cynthia's communications with Kelley were an exercise of her right to petition. They argued that her emails to Kelley, a city employee, implicated her right to petition because "[her] emails [were] plainly

9

communications 'likely to encourage review' by a governmental body." They further asserted that the McQuillings could not establish a prima facie case for each essential element of their defamation counterclaim. They supported their motion to dismiss with Cynthia's declaration, the McQuillings' live counterclaim pleading, and the emails with attached photographs that Cynthia sent to Kelley and later to Davis.

The McQuillings filed a response to the Drerups' amended TCPA motion to dismiss. They offered two arguments regarding why the motion should be denied. They claimed that the motion should be denied because the defamation claim was not based on Cynthia's exercise of her right of free speech or right to petition. And they claimed that the motion should be denied because they offered clear and specific evidence to establish a prima facie case for each element of their defamation claim.

The McQuillings' evidence supporting their response included Cynthia's emails and attached photographs that she had sent to Kelley. The McQuillings also offered the written disclosure that the Drerups had received when they bought their home, indicating that the flooding had been addressed and resolved by the installation of a gate at the end of the street.

In addition, they offered Thomas McQuilling's affidavit. His affidavit indicated that what Cyntia had referred to as a "concrete double wall" in her email to Kelley was a "concrete planter box." Regarding the planter box, Thomas testified:

10

My wife and I purchased the McQuilling Property in 1989. Along the fence line of the McQuilling Property was a concrete planter box which we chose to keep. The planter is approximately 22 inches tall. The McQuilling Property also had a wooden fence on the rear (east) of the property when we purchased the home, which we also chose to keep. The fence and the planter have existed on the McQuilling Property for decades and existed before we purchased the home.

Thomas testified that, historically, the drainage system of Broken Arrow Street has "redirected large quantities of water toward the McQuilling Property." He stated that the McQuillings' home flooded in 1992, 2002, 2003, 2008, and 2009 from water flowing from Broken Arrow Street. He averred that "[t]he planter and fence did not stop or impound the water coming off the properties on Broken Arrow Street and flowing down the street toward the McQuilling Property." Thomas stated, "Because our home had flooded so many times, we had did not believe that the planter and fence caused any flooding on Broken Arrow Street."

Thomas explained that, in 2008, he "replaced the fence on the McQuilling Property after it was knocked down by Hurricane Ike" and that he "had to repair [the] fence throughout the years due to persons knocking out boards in attempts to drain Broken Arrow Street." He testified that, "at substantial expense" to him, he "tore down the house on the McQuilling Property [in 2012] and rebuilt it approximately three feet higher in order to protect it from the floodwater coming from Broken Arrow Street." He stated that, "[a]s part of this rebuild, [he] kept the planter box and fence and they were part of the drainage plans approved for the

11

rebuild, which the City of Houston approved." Thomas also testified that he was aware of the gate that had been installed at the end of Broken Arrow Street, and he had believed that the gate resolved the flooding issues on that street.[3]

The trial court denied the Drerups' amended motion to dismiss the McQuillings' defamation claim pursuant to the TCPA. The Drerups then filed this interlocutory appeal. In their sole issue, the Drerups contend that the trial court erred by denying their motion.

## TCPA Framework and Standard of Review

The TCPA "is a bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019). The legislature enacted the TCPA to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002; *see In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (recognizing that purpose of TCPA is "to identify

---

[3] The McQuillings also offered a picture of the location of the gate, which showed that it was behind another gate on the lot of one of the street's residents. No evidence in the record reflects whether the gate was open at the time of the flooding involved in this case.

and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits").

To effectuate this dual purpose, the TCPA provides a three-step decisional process to determine whether a lawsuit or claim should be dismissed under the statute. *See Montelongo v. Abrea*, 622 S.W.3d 290, 296 (Tex. 2021). Under the first step, a movant must demonstrate that the legal action is based on or is in response to the movant's exercise of one of the rights listed in section 27.005(b), including, as claimed here, the right of free speech and right to petition. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b)(1)(A),(B).

If the first step is met—that is, the movant shows that the TCPA applies— then the burden shifts to the non-movant under the second step to establish by "clear and specific evidence a prima facie case for each essential element" of his claim. *Id.* § 27.005(c). Under the third step—even if the non-movant satisfies the second step—the court will nonetheless dismiss the legal action "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d).

We review de novo the denial of a TCPA motion to dismiss. *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 470 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (citing *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). When

13

determining "whether a legal action is subject to or should be dismissed under this chapter, the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). We view the pleadings and evidence in the light most favorable to the nonmovant. *Gaskamp*, 596 S.W.3d at 470; *N. Cypress Med. Ctr. Operating Co. GP, LLC v. Norvil*, 580 S.W.3d 280, 284–85 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## Analysis

### A. TCPA's Application

The Drerups contend that the TCPA applies to the McQuillings' defamation counterclaim because the claim is based on or in response to Cynthia's exercise of her right of free speech and right to petition. We begin by determining whether Cynthia's allegedly defamatory statements to Kelley are protected by the right of free speech because, if so, it is dispositive of the first step of our TCPA analysis. *See QBE Americas, Inc. v. Walker*, No. 05–20–00439–CV, 2021 WL 1976459, at *3 (Tex. App.—Dallas May 18, 2021, no pet. h.) (mem. op.). We note that the Supreme Court of Texas has held that the TCPA applied to a defendant's allegedly defamatory statements because he was exercising his right of free speech by making the

complained-of statements. *See Adams v. Starside Custom Builders LLC*, 547 S.W.3d 890, 897 (Tex. 2018).

Under the TCPA, the "exercise of the right of free speech" means "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). The TCPA defines "matter of public concern" to include "a matter of political, social, or other interest to the community" and "a subject of concern to the public." *Id.* § 27.001(7)(B)–(C).

To determine the nature of a legal action and the applicability of the TCPA, the plaintiff-nonmovant's pleadings are the best evidence. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017). Here, the McQuillings' live pleading relied on Cynthia's statements in her first email to Kelley as the basis for their defamation claim. As mentioned, the McQuillings' pleading identified the alleged defamatory statements as follows:

> On September 24, 2019, Cynthia Drerup sent an email to Desmone Kelley, a Field Supervisor for the City of Houston, describing the events of the flooding. In this email, Cynthia Drerup also stated that Tom McQuilling built the wall behind his fence on purpose so that it would flood Broken Arrow Street. Cynthia Drerup further stated that, as a homebuilder and an executive at Kickerillo Homes, Tom McQuilling "knew . . . what he was doing, and he's put all of [their] homes in harm's way for repeated flooding."

We agree with the Drerups that Cynthia's alleged defamatory statements regarding the cause of the flooding constitutes a communication made in connection with a matter of public concern, namely, flooding. *See* TEX. CIV. PRAC. & REM. CODE

15

§ 27.001(3), (7)(B)–(C). The McQuillings assert that the complained-of statements do not qualify as a matter of public concern because they concern only flooding on Broken Arrow Street. However, the flooding of a public street affects those in a community beyond those who live on the street. For instance, it affects the general public's access to the street, and it may impact drainage for a wider area. In addition, flooding of any neighborhood raises the societal costs of compensating and caring for those with flooded homes. Thus, the flooding of a public street by its nature meets the definition of a "matter of public concern" because it is "a matter of . . . interest to the community" and "a subject of concern to the public." *See id.* § 27.001(7)(B)–(C).

The McQuillings also argue that Cynthia's statements regarding the cause of the flooding do not qualify as an exercise of her right of free speech because "the right to free speech does not protect libelous or slanderous speech." The McQuillings indicate that Cynthia's statements that Thomas used his knowledge as a builder to construct the concrete wall on his property to purposefully flood Broken Arrow Street are not worthy of free-speech protection because they were untrue and harmed Thomas' reputation.

The Supreme Court of Texas rejected this type of argument in *Adams*:

We emphasize that whether [the defendant's] colorful allegations were valid, partly valid, or completely concocted by a disgruntled resident with an axe to grind is not the question before us. Further litigation may seek those answers. The question at this stage is whether [the

16

defendant's] challenged statements involve a "matter of public concern" as defined by the TCPA.

547 S.W.3d at 897. And, as another court observed, "the truthfulness of the complained-of statements is not determinative of whether the TCPA applies." *QBE Americas, Inc.*, 2021 WL 1976459, at *5 (citing *Adams*, 547 S.W.3d at 897); *see Garton v. Shiloh Vill. Partners, LLC*, No. 12–16–00286–CV, 2017 WL 6884451, at *3 (Tex. App.—Tyler Aug. 23, 2017, no pet.) (mem. op.) (explaining that TCPA movant has no burden to substantiate truth of her communications as part of her initial TCPA burden).

We conclude that Cynthia's alleged defamatory communication with Kelley, concerning the cause of the flooding, was made in connection with a matter of public concern because it was "a matter of . . . interest to the community" and "a subject of concern to the public." *See* Tex. Civ. Prac. & Rem. Code § 27.001(7)(B)–(C). Cynthia was therefore exercising her "right of free speech," as defined by the TCPA, when she emailed the complained-of communication to Kelley.[4] *See id.* § 27.001(3). As a result, the Drerups were entitled to file a motion to dismiss, challenging the

---

[4]    Because the Drerups met their burden to show that the McQuillings' defamation claim was based on Cynthia's exercise of her right of free speech, we need not address whether the complained-of communication qualified as the exercise of her right to petition. *See* Tex. Civ. Prac. & Rem. Code § 27.005(b); *Garton v. Shiloh Vill. Partners, LLC*, No. 12-16-00286-CV, 2017 WL 6884451, at *6 n.6 (Tex. App.—Tyler Aug. 23, 2017, no pet.) (mem. op.); *see also* Tex. R. App. P. 47.1.

17

sufficiency of the McQuillings' defamation allegations. *See Adams*, 547 S.W.3d at 897.

## B.     Prima Facie Case

### 1.     *Legal Principles*

Because the TCPA applied to their defamation claim, the McQuillings were required to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE § 27.005(c). A "prima facie" case "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d at 590.

The "clear and specific evidence" requirement means a "plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 591. The Supreme Court of Texas has rejected the idea that the TCPA establishes a heightened evidentiary standard. *See id.* at 591. Rather, the prima facie standard "is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at 590 (internal quotation marks omitted). Requiring "clear and specific evidence" means a non-movant plaintiff "must provide enough detail to show the factual basis for its claim" and must provide enough evidence "to support a rational inference that the allegation of fact is true." *Id.* at 590–91.

As mentioned, in deciding if dismissal is warranted, we "consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). To meet his burden of establishing a prima facie case, a plaintiff may rely on circumstantial evidence—indirect evidence that creates an inference to establish a central fact—unless "the connection between the fact and the inference is too weak to be of help in deciding the case." *Lipsky*, 460 S.W.3d at 589.

### 2. *Defamation*

Because the TCPA applied to Cynthia's statements, the McQuillings, as non-movant counter-plaintiffs, had the duty to make out a prima facie case for each element of their defamation claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). The elements for a prima facie case of defamation are (1) the defendant published a false statement of fact to a third party; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence, if the plaintiff is a private individual); and (4) damages, unless the statement constitutes defamation per se. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (citing *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017)). A plaintiff's evidence is sufficient to sustain a defamation claim if the evidence "establishes the

facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff." *In re Lipsky*, 460 S.W.3d at 591.

### a. False Statement of Fact

"The threshold requirement for a defamation claim is the publication of a false statement of fact to a third party." *QBE Americas, Inc.*, 2021 WL 1976459, at *6 (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)). On appeal, the Drerups do not dispute that the alleged defamatory statements cited in the McQuillings' live counterclaim pleading—that is, those in Cynthia's initial email to Kelley—were published to a third party (Kelley and later Davis) and involved statements of fact, such as Cynthia's statement that Thomas constructed the concrete wall. Instead, the Drerups assert that "[t]he dispositive issue for this case is that [Cynthia's] statements were substantially true, or her opinion."

"[U]nder the 'substantial truth doctrine' a publication's truth or falsity depends on whether the publication 'taken as a whole is more damaging to the plaintiff's reputation than a truthful [publication] would have been.'" *Rosenthal*, 529 S.W.3d at 434 (brackets in original) (quoting *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016)). When determining whether a publication is capable of a defamatory meaning, the court examines its "gist." *Id.* "That is, we construe the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Id.* (quoting *Turner v. KTRK*

*Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)); *see Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) ("It is well settled that 'the meaning of a publication and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.'") (quoting *Turner*, 38 S.W.3d at 115)).

"'Gist' refers to a publication or broadcast's main theme, central idea, thesis, or essence." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 629 (Tex. 2018). "[A] publication with specific statements that err in the details but that correctly convey the gist of a story is substantially true. Conversely, even if all the publication's individual statements are literally true, the story can convey a false or defamatory meaning by omitting or juxtaposing facts." *Rosenthal*, 529 S.W.3d at 434 (quoting *Neely v. Wilson*, 418 S.W.3d 52, 63–64 (Tex. 2013) (internal citations and quotation marks omitted)).

In his affidavit, Thomas testified that the 22-inch-high concrete planter box— which Cynthia referred to in her email as "a long and high concrete double wall"— was already on his property when he purchased it in 1989 and that the planter box had been there "for decades." In their brief, the Drerups acknowledge that Thomas's affidavit showed that he did not build the planter box. Nonetheless, they argue that

the gist of Cynthia's email statements were substantially true.[5] The Drerups point to Thomas's statement in his affidavit that, when he and Karen purchased the property in 1989, they "chose to keep" the cement planter box and that, when he and Karen rebuilt their home on the property in 2012, they "kept the planter."

The Drerups assert that Cynthia's statement that Thomas "built" the wall "amounts to nothing more than a minor inaccuracy." They contend,

> It is unreasonable to believe that the assertion that [Thomas] built the wall and fence is more damaging to his reputation than the fact that he owns and maintains such structures. Regardless of whether [Thomas] "built," "maintained" or "has" a wall and fence on his property, the gist of the statements is that those structures are located on the McQuilling property and seemingly were the cause of the flooding.

We disagree with the Drerups' characterization of the gist of Cynthia's statements. While Cynthia's email relayed that the cement wall on the McQuillings' property blocked the flow of water and caused flooding on her street, that information was conveyed within the context of her entire statement that Thomas built the cement wall "on purpose" to protect his own property from flooding by causing Broken Arrow Street to flood. The premise of Cynthia's complained-of

---

[5]  The Drerups also discuss the wood fence, asserting that it was substantially true that Thomas built it because—even though he testified that the wood fence was on the property when he purchased it in 1989—he stated in his affidavit that he replaced the fence in 2008 when it was damaged during Hurricane Ike. Cynthia mentioned the fence in her initial email to Kelley, but she attributed the flooding to the "cement double wall" and stated that Thomas had built the wall "on purpose," causing her street to flood. Thus, we will limit our discussion to evidence regarding the cement wall/planter.

22

statements was that Thomas had purposefully built the "cement double wall." She also conveyed that, because he was a homebuilder, Thomas knew "what he was doing," not only with respect to protecting his own property, but also with respect to harming his neighbors' property. Thus, rather than conveying merely that the cement wall had caused her property to flood, the gist of Cynthia's email was that Thomas had taken affirmative action, using his knowledge as a homebuilder, to construct the concrete wall "on purpose" to protect his property from flooding by using the wall to trap water on Broken Arrow Street to his neighbors' detriment.

Further, taken as a whole, Cynthia's statement that Thomas affirmatively and purposefully constructed "a double cement wall" was more damaging to Thomas's reputation than if she had conveyed that Thomas chose not to remove a feature of the property that had been there for decades. *See id.* The former implies a nefarious premeditation to harm his neighbors for his own selfish benefit while the latter, at most, implies a fortuitous circumstance accompanying his purchase of the property. We conclude that the McQuillings made a prima facie showing that Cynthia's statement was not substantially true, that is, they made a prima facie showing that it was false. Thus, the McQuillings' evidence established a prima facie case with respect to the first element of defamation.

### b. Defamatory Statement

A statement is defamatory if it tends to injure a person's reputation or impeach a person's honesty, integrity, or virtue. *HDG, Ltd. v. Blaschke*, No. 14–18–01017–CV, 2020 WL 1809140, at *7 (Tex. App.—Houston [14th Dist.] Apr. 9, 2020, no pet.) (mem. op.). For this determination, we construe the statement as a whole in light of surrounding circumstances based on how a reasonable person would perceive the entire statement. *In re Lipsky*, 460 S.W.3d at 594.

Cynthia's complained-of statements conveyed that Thomas caused her home and her street to flood by building a concrete wall on his property to block flood waters from draining from Broken Arrow Street unto his property. Cynthia told Kelley that "[h]e did this on purpose, he knew as a home builder what he was doing, and he's put all of our homes in harm's way for repeated flooding." In other words, Cynthia's statements conveyed that Thomas had intentionally engaged in conduct for his own selfish benefit to protect his property to the harm and detriment of his neighbors. A reasonable person could conclude these statements would tend to injure a person's reputation or impeach a person's honesty, integrity, or virtue. *See HDG, Ltd.*, 2020 WL 1809140, at *7. Thus, the McQuillings' evidence established a prima facie case for the second element of defamation.

### c.    Requisite Degree of Fault

Because Thomas is private plaintiff, the McQuillings' prima facie burden was to show that Cynthia acted with negligence. *See Lipsky*, 460 S.W.3d at 593. Under this standard, a plaintiff must show the defendant knew or should have known the defamatory statement was false. *Sanders v. Sanders*, No. 05–16–00248–CV, 2017 WL 3712167, at \*3 (Tex. App.—Dallas Aug. 29, 2017, no pet.) (mem. op.).

In their brief, the Drerups state that Cynthia "cannot be faulted" because she did not know "the exact construction history of the McQuilling property," pointing out that she had "only bought [her] home in [the] Frostwood [subdivision] a month" before it flooded. By this statement, the Drerups imply that Cynthia should not be held responsible for failing to investigate whether Thomas had constructed the cement planter box on his property and for accusing him of purposefully constructing it to protect his own property while harming his neighbors' property. However, this assertion is contrary to Texas case law, which provides that, in the defamation context, negligence is typified by the failure to investigate the truth or falsity of a statement before publication and the failure to act as a reasonably prudent person. *Hoskins v. Fuchs*, 517 S.W.3d 834, 843 (Tex. App.—Fort Worth 2016, pet. denied); *Fawcett v. Rogers*, 492 S.W.3d 18, 27 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

The Drerups also assert that Cynthia's email statements were not made negligently because they were made based on an investigation that she conducted on the day of the flood. Citing her declaration, the Drerups point out that Cynthia "conducted her own investigation by wading through waist deep floodwaters to determine the cause of the flooding on her street and in her home." They contend that "the McQuillings cannot show that [Cynthia's] statements, even if somehow faulty, were negligent" because "[s]he made them based on her personal real-time observations during a flooding event."

As evidence, the McQuillings offered Cynthia's emails and attached photos, which she sent to Kelley and later to Davis. The emails and photos conveyed the information Cynthia claims that she learned through her observations and investigation on the day of the flood, such as the presence of the "cement double wall" on the McQuillings' property. Cynthia's investigation and observations support a description of what she saw on the day of the flood, but they do not support her statement that, as a homebuilder, Thomas purposefully built the "cement double wall," thereby putting other homes in harm's way. A reasonably prudent person would not deduce that Thomas built the wall, or that the wall was constructed for a nefarious purpose, based merely on an observation that the wall was located on his property and that Broken Arrow Street had flooded.

The McQuillings also offered the written disclosure provided to the Drerups at the time they purchased their home. The disclosure informed the Drerups that a gate was installed at the end of Broken Arrow Street in 2017 to address flooding and indicated that the gate had resolved the issue. Cynthia's email to Kelley conveyed that Thomas's construction of the cement wall had caused her street to flood even though the disclosure she had received indicated that the gate had prevented flooding issues and had previously spared her home from flooding during widespread flooding events, including during Hurricane Harvey. Given this information, a rational inference could be made that a reasonable person would have questioned the accuracy of attributing the flooding to Thomas's conduct or to the double-cement wall without first confirming those facts.

We conclude that the McQuillings established a prima facie case regarding the third element of defamation.

### d. Damages

The elements of a prima facie case for defamation include damages, unless the statement constitutes defamation per se. *Bedford*, 520 S.W.3d at 904. The McQuillings asserted in their counterclaim and in their response to the Drerups' motion to dismiss that Cynthia's complained-of statements qualified as defamation per se. Defamation per se refers to false statements so obviously harmful that general damages, such as mental anguish and loss of reputation, may be presumed. *Anderson*

27

*v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018) (citing *Lipsky*, 460 S.W.3d at 593). Statements that injure a person in his office, profession, or occupation are typically classified as defamatory per se. *Tatum*, 554 S.W.3d at 624. Remarks that adversely reflect on a person's fitness to conduct his business or trade are deemed defamatory per se. *Lipsky*, 460 S.W.3d at 596.

The McQuillings assert that Cynthia's email statements to Kelley were defamatory per se because they reflected on Thomas's fitness as a homebuilder and executive of a homebuilding company. "To qualify as defamation per se under this category, the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to the plaintiff's trade, business, or profession and not merely upon the plaintiff's general characteristics." *Id.*; *see Hancock v. Variyam*, 400 S.W.3d 59, 66–67 (Tex. 2013) (recognizing that statement injures one in his profession when it "ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office") (internal quotation marks omitted)). The McQuillings assert that, by falsely accusing Thomas of using his knowledge as an executive of a homebuilding company to construct a wall in a manner that benefitted himself and protected his property while concomitantly harming people in the community by causing their homes to flood, Cynthia has cast Thomas as an unscrupulous and unethical homebuilder, thereby injuring his reputation.

28

Engaging in responsible construction practices that do not place the homebuilder's self-interest over safety or knowingly and intentionally cause harm to the surrounding community are important attributes for a homebuilder. *See Lipsky*, 460 S.W.3d at 596 (holding that statement conveying that natural-gas producer was polluter constituted defamation per se because environmental responsibility is important attribute to natural gas producers); *cf. Hancock*, 400 S.W.3d at 67–68 (holding that statements indicating doctor lacked veracity and dealt in half-truths was not defamatory per se because statements did not injure him in his profession as physician; trait of truthfulness not peculiar or unique to being physician). Cynthia's statements that Thomas purposefully built a cement wall to protect his property and to block the drainage from Broken Arrow Street, causing the surrounding community's homes to flood, suggests that Thomas lacks those attributes. Thus, the McQuillings made a prima facie showing that Cynthia's statements were actionable as defamation per se. *See Lipsky*, 460 S.W.3d at 596.

On appeal, Cynthia asserts that the McQuillings did not "establish by clear and specific evidence [Thomas's] profession as a homebuilder." In other words, they contend that the evidence did not sufficiently establish that Thomas's occupation was as a homebuilder. We disagree.

The TCPA specifically provides that a "court shall consider the pleadings" when determining whether to dismiss a case under the statute. TEX. CIV. PRAC. &

REM. CODE § 27.006(a). Here, the McQuillings' counterclaim states that Thomas's profession is a homebuilder. The Drerups contend that the counterclaim is not sufficient to establish him as a homebuilder, relying on the principal that "general allegations that merely recite the elements of a cause of action" do not constitute the "clear and specific evidence" needed to meet the prima facie burden under the TCPA. *Lipsky*, 460 S.W.3d at 590–91. "Instead, a plaintiff must provide enough detail to show the factual basis for its claim." *Id.*

The counterclaim was not the only evidence in the record establishing Thomas's profession. Cynthia's emails, which were offered by the McQuillings, also provide evidence of Thomas's profession. In her emails, Cynthia stated that Thomas was "an executive at Kickerillo Homes," referred to him as a homebuilder, stated that he "works for a homebuilder Kickerillo Homes," and indicated that he was "cfo [chief financial officer of] Kickerillo [H]omes."

The Drerups criticize the McQuillings' evidence because Thomas's affidavit did not mention his profession. We note that, while a court considers "supporting and opposing affidavits stating the facts on which the liability or defense is based," *see* TEX. CIV. PRAC. & REM. CODE § 27.006(a), the TCPA does not require the non-movant to offer an affidavit to meet his TCPA burden of establishing by "clear and specific evidence a prima facie case for each essential element" of his claim, *see id.* § 27.005(c). Based on the counterclaim and Cynthia's emails, the McQuillings

30

offered "clear and specific evidence" to establish Thomas's profession as a homebuilder. *See id.*; *see also Lipsky*, 460 S.W.3d at 590–91 (explaining that "clear and specific evidence" means non-movant plaintiff "must provide enough detail to show the factual basis for its claim" and must provide enough evidence "to support a rational inference that the allegation of fact is true").

We conclude that the McQuillings established a prima facie case of defamation per se. Thus, they have met their burden of establishing by "clear and specific evidence a prima facie case for each essential element" of their defamation counterclaim.[6] *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). Because the McQuillings met their TCPA burden, we hold that the trial court did not err in denying the Drerups' amended motion to dismiss.

---

[6] On appeal, the Drerups assert that the affirmative defense of conditional privilege—also known as qualified privilege—applies to Cynthia's communication with City of Houston employees Kelley and Davis. *See Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App.—San Antonio 1997, no writ) (recognizing that, when communication of alleged wrongful act is made to official authorized to protect public from such act, that communication is entitled to qualified privilege); *see also Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 610 (Tex. App.—San Antonio 2018, pet. denied) ("[R]eporting a crime to the police is qualifiedly privileged . . . ."). As the McQuillings point out, the Drerups did not plead the affirmative defense of conditional privilege in their answer, nor did they raise it in their TCPA motion to dismiss or in their reply. Thus, the Drerups' argument that conditional privilege applied to Cynthia's statements is waived for purposes of determining whether the trial court properly denied the Drerups' TCPA motion to dismiss, and we need not address it. *See* TEX. R. APP. P. 33.1(a); *Fawcett v. Grosu*, 498 S.W.3d 650, 663 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (holding, in appeal from denial of TCPA motion to dismiss defamation claim, that arguments based on affirmative defense of qualified privilege were waived because defense was not pleaded in defendant's answer).

We overrule the Drerups' sole issue.

## Conclusion

We affirm the trial court's order denying the amended motion to dismiss.


Richard Hightower
Justice

Panel consists of Justices Goodman, Hightower, and Rivas-Molloy.